RESOLUTION TRUST CORPORATION, as Receiver; Home Owners Savings Bank, F.S.B., Plaintiffs, Appellees,

v.

KEY FINANCIAL SERVICES, INC., Defendant, Appellant.

No. 00–2392.

United States Court of Appeals, First Circuit.

Heard Dec. 4, 2001.

Decided Feb. 12, 2002.

Daniel R. Warren, with whom Melissa M. Eckhause, and Thompson Hine & Flory LLP, were on brief, for appellant.

J. Scott Watson, Attorney, with whom Ann S. DuRoss, Assistant General Counsel, Colleen J. Boles, Senior Counsel, and Jaclyn C. Taner, Counsel, were on brief, for appellees.

Before SELYA, Circuit Judge, STAHL, Senior Circuit Judge, and LYNCH, Circuit Judge.

STAHL, Senior Circuit Judge.

This case involves a protracted dispute over a portfolio of loans sold by defendant-appellant, Key Financial Services, Inc. ("Key") to plaintiff-appellee, Home Owners Savings Bank ("Home Owners").[1] Key appeals from a series of adverse rulings by the district court, culminating in a court order that Key pay approximately $8.5 million in restitution damages and interest. Finding Key's arguments without merit, we affirm the rulings below.

## I.

In 1988, Key sold its interest in 335 first and second residential mortgage loans (with a total principal value of approxi-

---

1. In 1995, Home Owners Savings Bank was placed in receivership. The Resolution Trust Company ("RTC") entered its appearance as receiver in July 1995. The Federal Deposit Insurance Company ("FDIC") became the statutory successor to RTC on January 1, 1996. For purposes of this opinion, however, "Home Owners" will be used to refer collectively to the original plaintiff and its successors in interest.

mately $16.7 million) to Home Owners, a savings and loan institution whose business, in part, consisted of acquiring residential mortgage notes on the secondary market, at a price equal to the full outstanding balance on the loans plus 1.5% of their principal value. The parties executed a "Mortgage Loan Purchase Agreement" ("Agreement"), specifying the terms of the transaction. Section 2.5 of the Agreement delineated thirty-three representations and warranties regarding the notes being transferred, and § 3.1 specified that "the material breach of any representation or warranty" contained in § 2.5 or other related sections would require Key to repurchase, upon demand, the non-conforming mortgages.[2]

When the New England real estate market began to collapse in the early 1990s, certain loans acquired by Home Owners began to underperform. Upon investigation, Home Owners determined that the original property appraisals that accompanied some of the purchased mortgages were artificially inflated. In addition, the title insurance policies accompanying some of the loans included exceptions that Home Owners believed were inconsistent with representations made by Key in § 2.5(o) of the contract. The key representation was that "[t]here is in full force and effect an ALTA [American Land Title Association] Lender's Title Insurance Policy or other generally acceptable form of policy of in-surance with standard condominium endorsements, if applicable, acceptable to FNMA [Federal National Mortgage Association or 'Fannie Mae'] or FHLMC [Federal Home Loan Mortgage Corporation or 'Freddie Mac']." Despite this guarantee, Home Owners identified over 100 loans with non-conforming policies. All of the mortgages in question were originated[3] by U.S. Funding Inc. of America ("U.S.Funding") and had title policies issued by Stewart Title Company. Most of the U.S. Funding loans were second mortgages secured by residential properties and belonged to the "C Program," meaning that the consumer had a marginal credit history.

After Key rebuffed Home Owners' demand that the disputed mortgages be repurchased, Home Owners in 1989 filed suit in federal court.[4] Count I of its complaint alleged breach of contract, asserting that Key had materially breached its representation in § 2.5(o) because the Stewart Title policies on the U.S. Funding loans were not on ALTA forms and contained exceptions that did not comply with Fannie Mae and Freddie Mac guidelines. Home Owners sought relief under § 3.1 of the Agreement, which required Key to repurchase all non-conforming loans. Key filed a cross-motion for summary judgment, alleging, *inter alia*, that the title policies issued for the subject properties were acceptable

---

2. Section 3.1 states, in relevant part, "In the event of the material breach of any representation or warranty set forth in Sections '2.5', '2.6' and '6.1', Key hereby agrees, upon demand, to repurchase any Mortgage note with respect to which there shall have been a material breach as set forth above...."

3. The vast majority of the loans sold by Key were purchased on the secondary mortgage market. The term "originator" refers to the lender who initially dealt with the customer.

4. Home Owners maintains that it made its first written demand that Key repurchase all of the U.S. Funding loans on June 15, 1989, and reiterated this demand orally on August 30, 1989. When Key "unequivocally rejected" this demand by letter dated August 31, 1989, Key filed suit. Key, on the other hand, insists that Home Owners did not formally demand that Key repurchase the disputed mortgages until April 6, 1990. As the district court began its calculation of damages from the April 1990 date, any dispute over this point amounts to nothing of importance.

to Fannie Mae or Freddie Mac, and therefore complied with § 2.5(o).

Applying New York law,[5] the district court ruled in favor of Home Owners in 1992, finding that Key had materially breached the representations and warranties contained in § 2.5(o) in four distinct ways because the title policies (1) did not insure against real estate taxes that were presently due or past due; (2) included a survey exception; (3) contained an exception regarding the rights of tenants in possession broader than Fannie Mae or Freddie Mac permits; and (4) were not on ALTA forms and contained exceptions[6] that "had the effect of neutralizing the standard ALTA protections ... thereby violat[ing] the relevant FHLMC [sic] or FNMA Guidelines, which required that title policies be fully protective of the lender." *Home Owners Savings Bank v. Key Fin. Servs., Inc.*, No. 89–2366–WD, slip op. at 10 (D.Mass. Jan. 30, 1992) (hereinafter "Slip Opinion"). Having found Key liable,[7] the court gave the parties one week to submit a proposed final judgment to bring the matter to a close. *Id.* at 16.

The question regarding the proper amount of final judgment turned out to be much more complicated than the district court's order would have suggested, because a number of the U.S. Funding loans had gone "off-line," meaning that the mortgages had been removed from Home Owners' portfolio either because of foreclosure or because the interest in the loan had been sold. The parties disagreed as to how the off-line loans should be taken into account when crafting a final judgment. Unable to reach a mutually acceptable rationale, Home Owners filed a proposed judgment in May 1992, which Key opposed. Home Owners then filed a motion for summary judgment on the issue of damages.

For some reason not ascertainable from the record, this motion sat idle for three years. In September 1995, the case received a jump start when Key filed a motion to dismiss for lack of prosecution. At a status conference held shortly thereafter, the court denied Key's motion to dismiss and denied without prejudice Home Owners' motion for entry of judgment and motion for summary judgment on the issue of damages to allow for further development of the record. In March 1996, the parties filed cross motions for summary judgment offering alternative theories regarding the appropriate relief to which

---

**5.** Section 8.5 of the written contract explicitly states that the Agreement "shall be construed under the laws of the State of New York."

**6.** Specifically, the non-ALTA title policies contained an exception for statutory mechanic's liens and excluded any matter arising or occurring before the date the borrower acquired title.

**7.** In addition to the first count for breach of contract, Home Owners' complaint included a second count of misrepresentation and a third count under Mass. Gen. Laws ch. 93A, which alleged that Key had also breached representations concerning the appraisals on the property securing some of the mortgage notes and challenged Key's loan origination practices. In its first motion for partial summary judgment, Home Owners only sought relief under Count 1, which it claimed was amenable to resolution as a matter of law, because a favorable ruling on this count would be sufficient to establish Key's liability. Home Owners also filed a second motion for summary judgment, however, asking the court to reject Key's alleged affirmative defenses of estoppel and waiver regarding the issue of the allegedly faulty appraisals. The district court agreed with Home Owners' assessment and based its ruling solely on Count 1. Nevertheless, the court also granted Home Owners' second motion for partial summary judgment dismissing the affirmative defenses, a ruling which Key has not appealed. Accordingly, we focus solely on the breach of contract claim.

Home Owners was entitled: Key insisted that under the Agreement, its only obligation was to repurchase the defective loans still in Home Owners' possession, whereas Home Owners insisted that the relief should also take into account the loans that had gone off-line. A month later, the district court again ruled in favor of Home Owners. Specifically, the court concluded that Key's failure to repurchase the non-conforming loans upon demand, as required by § 3.1, was an independent breach of the Agreement. Accordingly, it found that Home Owners was entitled to pursue general contract remedies for breach of contract. The calculation of damages, however, was left for further proceedings after both parties conducted discovery.

Over the next three years, the district court was faced with numerous discovery disputes and motions in limine regarding the issue of damages. Finally, in 1999, the district court issued an order awarding Home Owners damages and prejudgment interest dating back to April 1990. *See supra* note 4. Finding that there were no outstanding issues of material fact regarding the computation of principal and interest, the district court on September 29, 2000 entered final judgment for Home Owners in the amount $8,509,609.64.[8] Key timely appealed.

## II.

On appeal, Key has not contested that the title insurance policies for the mortgage notes originating from U.S. Funding are inconsistent with its representations in § 2.5(*o*) of the Agreement. Instead, Key asserts that whatever breach it committed

was not material, and therefore it had no obligation to repurchase the loans at issue. Specifically, Key argues that the district court applied the wrong standard of materiality when it decided as a matter of law to grant partial summary judgment in favor of Home Owners with regard to the breach of contract claim. Furthermore, Key insists that the issue of materiality is highly fact dependent, thereby precluding resolution of the issue by motion for summary judgment.

The district court found that Key materially breached the representations and warranties in § 2.5(*o*) of the Agreement in the various ways detailed *supra*. In determining whether Key's breaches were material, the district court cited the standard articulated in *United States ex rel. Roman v. Schlesinger*, 404 F.Supp. 77, 85 (E.D.N.Y.1975), which asks whether "a misrepresentation ... concerns a fact likely to influence the decision-making process." Slip Opinion at 12. Key, on the other hand, maintains that under New York law, a breach of contract is material only if it "goes to the essence of the contract. That is, a breach is material if it defeats the object of the parties in making the contract and deprive[s] the injured party of the benefit that it justifiably expected." *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F.Supp.2d 711, 731 (S.D.N.Y.2000) (internal quotations omitted).

We reiterate that Key has not contested the determination that the title policies for the U.S. Funding loans were deficient in the ways explained by the district court;[9] rather, Key argues that these defi-

---

8. The judgment also awarded litigation costs, post-judgment interest and photocopying expenses to Home Owners.

9. At oral argument, appellant's counsel specifically stated that Key was "not contesting

... that the exceptions in the title policy were not consistent with the [Fannie Mae and Freddie Mac] guidelines in effect at that time."

ciencies should not be considered material in light of the intentions of the parties—particularly regarding loan resale—at the time they entered into the Agreement. Key's proposed analysis of the issues in this case would be proper if Home Owners had argued that Key's breaches were so material as to entitle it to walk away from the Agreement entirely. But in this case, Home Owners just seeks repurchase of the loans with defective title policies, which only comprised approximately one-third of the mortgage notes involved in the original sale. Rather than attempting to "unwind the transaction," Home Owners is merely asserting its rights under the Agreement, which provided that "[i]n the event of the material breach of any representation or warranty set forth in Section[ ] '2.5' ... Key hereby agrees, upon demand, to repurchase any Mortgage note with respect to which there shall have been a material breach...."

█ The district court's characterization of this case as one involving rescission without any further explanation, *see* Slip Opinion at 1, may have caused some confusion. Home Owners did not seek the complete dissolution of the Agreement, but rather simply wanted Key to repurchase a particular subset of loans—the U.S. Funding loans with non-conforming title policies—as the Agreement specified. Therefore, while the district court's reliance on the materiality standard from *Schlesinger*, a fraudulent inducement case, may not have been directly on point, Key's citation of the *Times Mirror* materiality test, which was crafted in the context of a case where the nonbreaching party sought rescission from the court rather than seeking relief based on a contractual provision, is inapposite as well.[10] The appropriate question is whether the title deficiencies constituted a material breach of the representations and warranties contained in § 2.5(*o*), and not whether the representations made in § 2.5(*o*) were material to the Agreement as a whole. Accordingly, we find that the district court properly determined as a matter of law that Key materially breached § 2.5(*o*) of the Agreement due to the deficiencies in the U.S. Funding loans' title policies, thus triggering the repurchase remedy provided in § 3.1. Key's attempt to inject disputed issues of fact into the case is inappropriate and reflects its misunderstanding of the significance of the term "material."[11] Therefore, we affirm the district court's rulings regarding liability.[12]

10. Rather than turning to pure rescission cases or fraudulent inducement cases for guidance, we find this case to be particularly analogous to a case involving the breach of an express warranty. Key warranted that the loans would be Fannie Mae and Freddie Mac compliant, and that the title policies would be on ALTA forms, thereby incorporating the standard protections included thereon. These explicit warranties were breached. Because there can be no dispute about the existence of these express warranties, it appears that, under New York law, Home Owners need not even prove that it had actually relied on the warranties when entering into the transaction. *See CPC Int'l Inc. v. McKesson Corp.*, 134 Misc.2d 834, 513 N.Y.S.2d 319, 323 (Sup. Ct.1987) ("This court declines to require a finding of reliance to permit recovery for breach of the warranties in the contract.");

*see also CBS Inc. v. Ziff–Davis Publ'g*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997, 1001 (1990) (affirming the *CPC* court's "view of 'reliance' ... as requiring no more than reliance on the express warranty as being a part of the bargain between the parties").

11. For example, Key's proffered evidence suggesting that other participants in the secondary mortgage market would have found the title policies acceptable is irrelevant to the question of whether Key materially breached the representations and warranties it expressly made in § 2.5.

12. We likewise affirm the district court's evidentiary rulings that excluded any evidence regarding Home Owners' alleged intentions at the time it entered into the transaction.

## III.

■ We now turn to the issue of damages. Key first contests the district court's determination that it committed an independent breach by failing to repurchase the loans upon Home Owners' demand, thus entitling Home Owners to general contract damages. Key claims that repurchase is Home Owners' sole remedy under the contract, and therefore, awarding general contract damages provides Home Owners with a windfall.[13] Key's argument is misplaced. Whether or not Key committed an independent breach by failing to repurchase on demand, the district court was free to make Home Owners whole, and it did so in terms of the obligation imposed by the contract.

■ Had Key repurchased the loans at the time of the initial demand, the parties (and the district court) would not have been faced with the complicated question of how to deal with the numerous loans that subsequently went off-line. Home Owners obviously would have preferred that Key repurchase the loans back in 1989, rather than find itself trying to determine years later the amount of mone-

tary damage resulting from Key's failure to do so. A repurchase provision is designed to shift the risk to the selling party in the event that a dispute arises.[14] Key's position—that on a finding of material breach of contract the judge was precluded from awarding damages equal to the repurchase amount—makes no sense in light of the fact that the provision negotiated by the parties states that Key will repurchase "upon demand." More than arguably, Key appears to be the party that is trying to take advantage of whatever "windfall" will result from the fact that the vast majority of the disputed loans have gone off-line.[15] Key and Home Owners, two sophisticated parties, negotiated how the risks and costs of this transaction would be distributed, and resolved the issue by drafting § 3.1. Key's cries of injustice fall on deaf ears, as Key freely contracted for the obligations by which it now finds itself bound.[16]

Likewise, we discern no error in the district court's determination of the appropriate amount for the judgment. The district court was satisfied that it had sufficient information before it to enter

13. In making its argument, Key refers specifically to the last sentence of § 3.1, which provides: "Except for the indemnities provided in Section '7,' [repurchase] is the sole and exclusive remedy for any material breach of any representation or warranty as herein provided."

14. For this reason, it is irrelevant that the loans may have suffered a loss in value because of changing market conditions rather than because of the deficiencies in the loans' title policies. Section 3.1 obligated Key to repurchase these faulty mortgages upon demand, meaning that from the moment a proper repurchase demand was made, Key—not Home Owners—should have borne the risk of any market fluctuations.

15. In fact, the district court's calculation of damages merely represents what Key would have paid Home Owners had it repurchased the loans when it was supposed to have done

so (using the date most favorable to Key—April 1990), plus statutory interest from that date, plus the costs of mitigation and servicing, less the payments received on account of the loans from the date of demand to the date of judgment. The court is unpersuaded by Key's argument that this judgment somehow results in a "windfall" for Home Owners.

16. We find it to be of no significance that the district court reached its determination regarding the appropriate damage award by characterizing Key's failure to repurchase the loans upon demand as an independent breach of the contract. The judgment can just as easily be characterized as "make-whole" relief for the non-breaching party in light of the fact that the prenegotiated remedy provision had failed in its purpose because many of the loans had gone off-line.

judgment, and found no merit in Key's arguments suggesting that there was inadequate documentation. We find no reason to quibble with the district court's assessment. Had Key satisfied its repurchase obligation immediately, many of these arguments over documentation would never have materialized.

## IV.

After almost a decade of litigation, which helped to make the record below not always a model of clarity, we are satisfied that the various rulings and final judgment ultimately entered by the district court were sound.

***Affirmed. Costs to Appellees.***