**NSA INVESTMENTS II LLC, Plaintiff,**

**v.**

**SERANOVA, INC., Intelligroup, Inc., Rajkumar Koneru, and Ravi Singh, Defendants.**

**No. Civ.A. 01–10223–PBS.**

United States District Court, D. Massachusetts.

Sept. 30, 2002.

Greer N. Shaw, Goodwin Procter, LLP, Boston, MA, Mark E. Tully, for NSA Investments II, LLC, plaintiff.

Kevin J. Lesinski, Choate, Hall & Stewart, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## INTRODUCTION

Plaintiff NSA Investments II LLC ("NSA") moves for partial summary judgment against defendant SeraNova, Inc. ("SeraNova") on its claim of breach of contract, based on SeraNova's alleged breach of three express warranties contained in a Stock Purchase Agreement between NSA and SeraNova. After hearing, NSA's motion is *ALLOWED–IN–PART.*

## STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly pro-

bative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## UNDISPUTED FACTS

There is no genuine issue as to any of the following facts:

### I. NSA's Investment in SeraNova

SeraNova was originally a wholly-owned subsidiary of Intelligroup, Inc. ("Intelligroup"). In a December 13, 1999 press release, Intelligroup described SeraNova as its "global Internet services unit," and announced plans "to spin off SeraNova as a separate company by the end of the first quarter of 2000, subject to regulatory approvals."

The spin-off plan called for each Intelligroup shareholder to receive SeraNova common stock shares equal in number to the Intelligroup common stock shares held by that shareholder; if an Intelligroup shareholder owned 5 shares of Intelligroup stock, she would receive 5 shares of SeraNova stock. In addition, SeraNova conducted a private placement offering whereby five investors agreed to purchase additional SeraNova shares for a combined total of $10 million.

NSA was one of the private placement investors. On March 14, 2000, SeraNova and NSA executed a Stock Purchase Agreement ("SPA"), whereby NSA agreed to purchase twenty shares of SeraNova common stock for $4 million. The SPA included two sets of express representations and warranties, one set made by SeraNova and the other by NSA. In para-

graph 2.13, SeraNova warranted that its Form 10 registration for the spin-off "complied in all material respects with the requirements of the Securities Act and of the Securities Exchange Act of 1934 . . . and the rules and regulations of the [Securities and Exchange Commission]." On March 27, 2000—the "closing date"—NSA wired $4 million to SeraNova, pursuant to the SPA.

## II. SeraNova's Dealings with the SEC

On January 27, 2000, SeraNova filed with the Securities and Exchange Commission ("SEC") a Form 10 Registration Statement ("Form 10"), in connection with the intended spin-off of SeraNova from Intelligroup.

On February 24, 2000, the SEC responded to SeraNova's Form 10 filing with forty-nine comments requesting revision to, or supplementation of, the Form 10 filed by SeraNova. Several comments identified specific regulations with which SeraNova's Form 10 failed to comply. Moreover, the SEC asked SeraNova to explain why SeraNova believed it did not have to register the spin-off under the Securities Act of 1933. The SEC concluded by requesting that SeraNova file an amendment in response to the SEC's letter.

On March 17, 2000, SeraNova filed Amendment No. 1 to its Form 10. The Amendment revised and supplemented the Form 10 in dozens of respects, as described in a letter to the SEC. However, SeraNova continued to maintain that it did not need to register the spin-off under the Securities Act of 1933.

On March 24, 2000, SeraNova informed the SEC that it was "hereby withdraw[ing] from registration its Registration Statement on Form 10 . . . [and its] Amendment No. 1 to the Registration Statement and all exhibits relating to such Registration Statement and Amendment." Also on March 24, 2000, SeraNova issued a press release stating, "In compliance with SEC rules, which require a company to withdraw and refile when the review process exceeds the statutory sixty-day period, SeraNova withdrew its Form 10 Friday for this technical issue and will refile shortly."

On April 7, 2000, the SEC sent SeraNova a letter commenting on SeraNova's (withdrawn) Form 10 Amendment. As an initial matter, the SEC told SeraNova that it disagreed with SeraNova's position that the spin-off need not be registered under the Securities Act of 1933; the SEC asked SeraNova to "file a Form S–1 to register the [stock] distribution." The SEC went on to discuss twenty-three sections of the Form 10 that, in the SEC's view, needed to be revised or supplemented.

On April 17, 2000, SeraNova filed a Form S–1 with the SEC to register the SeraNova spin-off. As SeraNova noted in a letter to the SEC, the content of the Form S–1 responded to certain of the SEC's comments in its April 7, 2000 letter.

In a April 28, 2000 letter, the SEC responded to SeraNova's Form S–1 filing. The letter made several requests for revision or supplementation. The SEC concluded by stating, "An amendment should be filed in response to this letter."

On May 17, 2000, SeraNova filed Amendment No. 1 to its Form S–1. In a letter to the SEC, SeraNova detailed how it had revised and supplemented the Form S–1 in response to the SEC's April 28, 2000 comments.

On May 25, 2000, the SEC sent SeraNova a letter commenting on its Amendment No. 1 to the Form S–1. The SEC requested a new amendment.

On June 16, 2000, SeraNova filed Amendment No. 2 to the Form S–1. After

additional correspondence between Sera-Nova and the SEC regarding certain liquidity issues, SeraNova's Amendment No. 2 was declared effective as of June 29, 2000.

## LEGAL ANALYSIS

### I. Elements of a Claim for Breach of Contract

The parties agree that under the SPA, New York law governs NSA's claim for breach of contract. To prevail on a claim of breach of contract under New York common law, a plaintiff must prove "the terms of the agreement, the consideration, the performance by plaintiff[ ] and the basis of the alleged breach of the agreement by defendant." *Furia v. Furia*, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (N.Y.App.Div.1986). It is undisputed that NSA has shown the terms of the SPA, the consideration, and NSA's performance. This leaves the element of breach by Sera-Nova. But before analyzing whether Sera-Nova breached the SPA, the Court must address two other issues raised by Sera-Nova: (A) whether NSA must prove it relied on the warranties that SeraNova allegedly breached, and (B) whether NSA must prove actual damages.

### A. Reliance

█ SeraNova contends that to prevail on a claim of breach of contract, NSA must demonstrate that it relied on the express warranties. SeraNova urges that NSA cannot prove reliance, for two reasons. First, SeraNova argues that NSA cannot meet the standard for reliance set out in *CBS, Inc. v. Ziff–Davis Publishing, Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (N.Y.1990). SeraNova interprets *Ziff–Davis* as requiring that the express warranties were "bargained-for" in the sense that they were the subject of actual bargaining by the parties: exchang-ing of proposals, haggling over terms, etc. In SeraNova's view, because NSA accepted SeraNova's initial proposal for the terms of the express warranties—without suggesting alternatives—NSA cannot prove that the terms were "bargained-for." Second, SeraNova argues that NSA did not rely on the truth of the express warranties.

NSA counters that to establish the requisite reliance NSA need show only that the express warranties were part of the "bargain" between the parties, *i.e.*, part of the package of promises NSA received from SeraNova in the SPA. New York law supports NSA's position. The *Ziff–Davis* court addressed the following question: "Did the buyer's manifested lack of belief in and reliance on the truth of the warranted information prior to the closing relieve the seller of its obligations under [express] warranties?" 75 N.Y.2d at 499, 554 N.Y.S.2d 449, 553 N.E.2d at 998. The court's answer was no because "[t]he critical question is not whether the buyer believed in the truth of the warranted information ... but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth].'" 75 N.Y.2d at 503, 554 N.Y.S.2d 449, 553 N.E.2d at 1001 (*quoting Ainger v. Michigan Gen. Corp.* 476 F.Supp. 1209, 1225 (S.D.N.Y.1979), *aff'd* 632 F.2d 1025 (2nd Cir.1980)). The court explained:

This view of "reliance"—i.e., as requiring no more than reliance on the express warranty as being a part of the bargain between the parties—reflects the prevailing perception of an action for breach of express warranty as one that is no longer grounded in tort, but essentially in contract. The express warranty is as much a part of the contract as any other term. Once the express warranty is shown to have been relied on as part of the contract, the right to be indemni-

fied in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached.

75 N.Y.2d at 503–04, 554 N.Y.S.2d 449, 553 N.E.2d at 1001 (citations omitted). Thus, as a practical matter proof of reliance amounts to proof of the existence of an express warranty. *See Ainger*, 476 F.Supp. at 1225 ("It is true that courts, especially in New York, use the word 'reliance' in warranty cases. In these contexts, however, the word relates to the first element of proof, existence of the contract."); *Resolution Trust Corp. v. Key Fin. Servs., Inc.*, 280 F.3d 12, 17 n. 10 (1st Cir.2002) ("Because there can be no dispute about the existence of these express warranties, it appears that, under New York law, [the warrantee] need not even prove that it had actually relied on the warranties before entering the transaction.").

*Ziff–Davis* defeats both of SeraNova's reliance arguments. SeraNova's argument that NSA must demonstrate that the parties haggled over the express warranties misinterprets the *Ziff–Davis* court's reference to the "bargain between the parties." This phrase is synonymous with "contract between the parties," and requires only proof of the existence of an express warranty. *See* 75 N.Y.2d at 503–04, 554 N.Y.S.2d 449, 553 N.E.2d at 1001. Indeed, the Second Circuit, applying *Ziff–Davis,* rejected precisely the argument now advanced by SeraNova. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2nd. Cir.1992) ("Since as a matter of law, an express warranty is as much a part of the contract as any other term, the inclusion in the Agreement here of the 'Representations and Warranties of Express and the Stockholders' established that those representations and warranties were part of the bargain reached between [the parties].").

SeraNova's second reliance argument, that the evidence shows NSA did not rely on the truth of the express warranties, also cannot be reconciled with *Ziff–Davis.* In *Ziff–Davis*, the warrantee did not believe in or rely on the truth of the warranty. 75 N.Y.2d at 498–99, 554 N.Y.S.2d 449, 553 N.E.2d at 998. Nonetheless, the court stated:

We see no reason why the [warrantor] should be absolved from its warranty obligations under these circumstances. A holding that it should because [the warrantee] questioned the truth of the facts warranted would have the effect of depriving the express warranties of their only value to [the warrantee]—i.e., as continuing promises by [the warrantor] to indemnify [the warrantee] if the facts warranted proved to be untrue.

75 N.Y.2d at 505–06, 554 N.Y.S.2d 449, 553 N.E.2d at 1002. Under *Ziff–Davis,* reliance turns on the existence of the warranty, not the warrantee's belief in the warranty.

■ At the hearing, SeraNova raised a new but related argument, contending that because NSA was on notice of the fact that SeraNova's Form 10 had been withdrawn prior to the SPA closing on March 27, 2000, NSA waived any claim for breach of paragraph 2.13 of the SPA. SeraNova cited *Galli v. Metz*, 973 F.2d 145, 151 (2nd Cir. 1992) which held: "Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach." The Court rejects SeraNova's waiver argument, for three reasons.

First, it is untimely. SeraNova first raised it at the hearing.

Second, *Galli* is distinguishable. The *Galli* holding was directed at situations "where the parties agree at closing that certain warranties are not accurate" and where the warrantee has "full knowledge and acceptance of facts disclosed by the [warrantor] which would constitute a breach of warranty under the terms of the contract." 973 F.2d at 151. *See also Pro-muto v. Waste Mgmt.*, 44 F.Supp.2d 628, 648 (S.D.N.Y.1999) ("[I]n order to conclude that plaintiffs have waived their right to assert a claim for breach of warranty, we must find that, prior to closing, defendants themselves actively disclosed to plaintiffs facts which would have constituted a beach of the warranties."). In *Galli*, the Court emphasized that waiver is triggered only where the seller disclosed the facts which would constitute the breach. Where the problem was common knowledge or disclosed by a third person, the buyer purchases a warranty "as insurance" against the breach and is protected by the warranty under *Ziff–Davis*. *Id.* at 151.

Here, there is no evidence to support the notion that, as of the closing, SeraNova disclosed that its Form 10 was legally deficient. At most, SeraNova can rely on relevant documents that were publicly available prior to the closing. There are two such documents in the record: (1) SeraNova's Amendment No. 1 to its Form 10, and (2) SeraNova's March 24, 2000 press release announcing its withdrawal of its Form 10.[1] Neither document provided facts that would constitute a breach. Were NSA to have compared the Amendment No. 1 to the original Form 10, NSA could have discerned revisions and supplementation, but such changes did not neces-

sarily mean that the original Form 10's content was legally deficient—nor did these changes put NSA on notice that the Form 10 was the inappropriate vehicle for the spin-off registration. Similarly, the SeraNova press release provided no evidence that the Form 10 was legally deficient. To the contrary, the press release attributed the Form 10 withdrawal to a timing issue: "In compliance with SEC rules, which require a company to withdraw and refile when the review process exceeds the statutory sixty-day period, SeraNova withdrew its Form 10 Friday for this technical issue and will refile shortly."

Third, paragraph 7.9 of the SPA expressly states that "[a]ny term of this Agreement may be waived only with the written consent of the Company and the Purchaser." The Court interprets this language as an express reservation of all rights under the SPA, one which could be overcome only by a written waiver, not an implied waiver of the sort SeraNova urges. *See Galli*, 973 F.2d at 151 (no implied waiver where "the [warrantee] expressly preserves his rights under the warranties"); *cf. Pegasus Mgmt. Co. v. Lyssa, Inc.*, 995 F.Supp. 29, 38 (D.Mass.1998) ("[T]here can be no doubt that the [warrantees] expressly reserved their rights . . . Thus, if the law of Connecticut were as set forth in the *Ziff–Davis* and *Galli* cases, the plaintiffs . . . would be unable to prevail on an affirmative defense that the plaintiffs waived any of the breaches.")

In sum, the Court holds that NSA has established the requisite reliance for a claim of breach of express warranty by demonstrating the existence of the express warranties in the SPA, and finds that even if SeraNova had raised its waiver argu-

---

1. SeraNova has not demonstrated that any other relevant documents—including SeraNova's correspondence with the SEC regarding the Form 10—were publicly available prior to the closing.

ment in a timely fashion—which it did not—the argument would have failed.

## B. Damages

SeraNova belatedly argues that NSA must prove it suffered actual damages as a result of SeraNova's alleged breach, and that NSA has failed to show such damages. SeraNova raised this argument for the first time in its surreply. In support of this argument, SeraNova relies on *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey,* 173 F.3d 454, 465 (2nd Cir.1999) (holding "[u]nder New York law, in fact, '[t]he failure to prove damages is ... fatal to [a] plaintiff's breach of contract cause of action' ") (*quoting Cramer v. Spada,* 203 A.D.2d 739, 610 N.Y.S.2d 662, 664 (N.Y.App.Div.1994)). *See also Van Brunt v. Rauschenberg,* 799 F.Supp. 1467, 1470 (S.D.N.Y.1992) (stating "[t]he essential elements to pleading a breach of contract under New York law are the making of an agreement, due performance by the plaintiff, breach by the defendant, and damage suffered by the plaintiff").

However, New York case law is not so clearcut. In *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 95, 595 N.Y.S.2d 931, 612 N.E.2d 289, 292 (N.Y.1993), the New York Court of Appeals stated that "[n]ominal damages are always available in breach of contract actions." On this score, the court distinguished between contract and tort claims:

> There is no anomaly in the fact that nominal damages are recognized in plaintiff's breach of contract claim against [defendant] but disallowed in this tort action [for inducement of breach of contract], in which the same contractual breach is an element. Fundamentally different functions are served by an action in tort on the one hand, and an action in contract on the other, and an understanding of that functional difference is critical to understanding why nominal damages are appropriate in one and not in the other. Contract liability is "imposed by the law for the protection of a single, limited interest, that of having the promises of others performed *** The law of torts *** is concerned with the allocation of losses arising out of human activities." In other words, a party's rights in contract arise from the parties' promises and exist independent of any breach. Nominal damages allow vindication of those rights. In tort, however, there is no enforceable right until there is a loss. It is the incurring of damages that engenders a legally cognizable right.

81 N.Y.2d at 96, 595 N.Y.S.2d 931, 612 N.E.2d at 293 (citation omitted).

Because SeraNova raised this issue in an untimely fashion, the parties have not briefed the interplay between *Kronos* and *LNC Investments.* Nor have they briefed whether actual damages flowed from SeraNova's purported breach of the express warranties. This issue is simply not ripe for resolution.

## II. SeraNova's Breach

■ With the issues of reliance and damages addressed, the final question is whether SeraNova breached the SPA. NSA asserts that SeraNova materially breached the three express warranties set out in paragraphs 2.13, 2.12, and 2.10 of the SPA. SeraNova contends that it complied with these warranties, or that at a minimum there are issues of fact that must be tried to a jury.

The analysis begins with the language of paragraph 2.13. Paragraph 2.13 states:

> **2.13 *Form 10.*** As of the date filed with the Commission, the Form 10 complied in all material respects with the requirements of the Securities Act and the Securities Exchange Act of 1934, as

amended (the *"Exchange Act"*), and the rules and regulations of the Commission promulgated thereunder which are applicable thereto.

Paragraph 2 defines "Commission" as the United States Securities and Exchange Commission (the SEC).

"Whether or not a contract provision is ambiguous is a question of law to be resolved by a court." *Van Wagner Adver. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756, 758 (N.Y.1986). The Court concludes that the meaning of paragraph 2.13 is unambiguous: it requires that as of the date SeraNova filed its Form 10 with the SEC, the Form 10 materially complied in form and content with SEC rules and regulations.

SeraNova breached this warranty. When the SPA was executed on March 14, 2000, the SEC had already notified SeraNova—via a February 24, 2000 letter—that SeraNova's original Form 10 was in need of substantial revision and supplementation, and had requested an amendment to the Form 10. In support of several of its comments, the SEC cited particular rules and regulations with which—in the SEC's view—the Form 10 failed to comply. Moreover, the SEC questioned why SeraNova had failed to register under the Securities Act of 1933 in light of the fact that the SeraNova spin-off involved the restricted shares of two companies that Intelligroup had acquired less than two years before.[2]

The SEC's February 24, 2000 letter set off an extended colloquy between the SEC and SeraNova. Responding to the SEC's comments, SeraNova filed Amendment No. 1 to its Form 10 on March 17, 2000. On March 24, 2000, SeraNova withdrew its Form 10 and its Amendment No. 1. On April 7, 2000, the SEC sent SeraNova a letter critiquing the (withdrawn) Amendment No. 1, and asking SeraNova to register a Form S-1 (under the Securities Act of 1933). On April 17, 2000, SeraNova filed a Form S-1. In response to further SEC comments, SeraNova eventually filed two amendments to its Form S-1. The SEC declared SeraNova's Amendment No. 2 effective as of June 29, 2000.

It is undisputed that the SEC concluded SeraNova's Form 10 failed to comply with SEC rules and regulations. The SEC maintained that the Form 10 was an inappropriate vehicle to register the SeraNova spin-off, and identified dozens of sections of the Form 10 that needed to be revised and supplemented, pointing to specific rules and regulations to support its comments.

SeraNova fails to make a credible argument that the SEC was incorrect in its legal conclusions. On the issue of whether the Form 10 was the proper vehicle to register the spin-off, SeraNova relies solely on a "Staff Bulletin" issued by the SEC on September 16, 1997; SeraNova argues that the bulletin set out a five part test for when a party need not file under the Secu-

---

2. Specifically, the SEC stated in its letter dated February 24, 2000 (¶ 3): "Tell us why you believe you do not need to register the transaction under the Securities Act in light of your acquisition of Network Publishing, Inc. in January 1999. We also note the acquisition of Azimuth Companies Securities in November 1998." In a March 17, 2000 letter (¶ 3), SeraNova explained that while an SEC Staff Bulletin precluded usage of Form 10 to spin off "restricted securities" that a parent has held for less than two years, SeraNova did not fall within this preclusion: "although Intelligroup has not held the shares of the Azimuth Companies or Network Publishing, Inc. for two years, Intelligroup did not acquire such the [sic] shares with the intent to distribute such securities." On April 7, 2000, the SEC rejected this explanation and required a Form S-1 to register the distribution. On April 17, 2000, SeraNova filed the Form S-1.

rities Act of 1933, and contends that SeraNova's spin-off satisfied the test. In its briefs, SeraNova does not specify any of the five factors, nor does SeraNova describe how the SeraNova spin-off satisfied these factors. Instead, SeraNova relies on an affidavit from one of the lawyers that worked on the SeraNova spin-off. (*See* Aff. of James E. Abbott in Opp'n to Pl.'s Mot. for Summ.J., Docket No. 54.) But Mr. Abbot's affidavit does not buttress SeraNova's argument; he simply paraphrases another SeraNova attorney's interpretation of the SEC bulletin, then states that "it appears that the spin-off of SeraNova satisfied the above-mentioned conditions." (*Id.* ¶ 7.) Such a conclusory statement, grounded only in hearsay and a fellow attorney's opinion, without legal citation or factual evidence does not suffice to create a disputed issue of fact as to whether Form 10 was the proper form for the spin-off. Indeed, the SEC had a factual basis for rejecting the Form 10 because there was a sale of a restricted security within two years. SeraNova's prompt and lamb-like obeisance to the SEC's decision to require a Form S–1 is strong proof that the Form 10 was the wrong document.

Moreover, SeraNova brought the same bulletin to the SEC's attention on March 17, 2000, and the SEC responded that it disagreed with SeraNova's interpretation of the bulletin. Thus, SeraNova is left with the tenuous argument that the SEC misinterpreted its own bulletin. *Cf. Sec. and Exch. Comm'n v. Zandford*, 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (holding that SEC interpretation of federal securities law "is entitled to deference if it is reasonable").

On the issue of whether the content of the Form 10 satisfied the SEC rules and regulations, SeraNova does not even try to refute the SEC's comments identifying what the SEC believed to be numerous instances in which the material contained in the Form 10 was legally deficient. Instead, SeraNova relies again on Mr. Abbot's affidavit. Mr. Abbott's affidavit sets out categories of information that he asserts must be disclosed in a Form 10, and then makes the conclusory assertion that "[t]o my knowledge, the Form 10 filed by SeraNova on January 27, 2000 disclosed information falling within the above categories." (Docket No. 54 ¶ 6.)

This will not do. In order to show that content of the Form 10 materially complied with the SEC's rules and regulations, SeraNova must demonstrate that *each* of the SEC's comments was either immaterial or incorrect as a matter of law. Since SeraNova does not specifically address *any* of the SEC's comments as to the content of the Form 10, SeraNova has utterly failed to make the requisite showing. In sum, the Court concludes that SeraNova breached the unambiguous promise it made in paragraph 2.13 of the SPA, and therefore the Court holds that NSA has proven SeraNova's liability for breach of contract.

### III. The Other Warranties

In light of the resolution of the dispute involving the warranty in paragraph 2.13, the Court need not resolve the dispute concerning the warranties in paragraphs 2.12 and 2.10, as any breach of those warranties would not provide the basis for additional damages. The linchpin of NSA's damages theory is the timing of the SeraNova spin-off; NSA contends that "[t]he single most important factor for NSA in making its investment was that SeraNova's spin-off into a publicly-traded company would occur immediately following the Private Placement. . . . NSA would not have participated in the Private Placement had it been told or had it believed that the spin-off would be delayed for sev-

eral weeks or months." (Mem. in Supp. of Pl.Mot. for Summ.J. of Liability for Breach of Contract, Docket No. 44, at 1–2.) In light of the Court's holding that 2.13 was breached, NSA must show that a breach of paragraphs 2.12 and 2.10 would have resulted in delay beyond that flowing from the breach of paragraph 2.13. Because the SEC continued to critique Sera-Nova's spin-off registration—the subject of paragraph 2.13—into late June 2000, NSA must show that any breach of paragraphs 2.12 and 2.10 delayed the spin-off beyond late June 2000.

NSA cannot make such a showing. Paragraph 2.12 is aimed at the existence of liens or encumbrances on SeraNova's assets. NSA alleges that this warranty was breached because SeraNova did not disclose the terms of a lien held by PNC Bank. But this lien was discharged on May 29, 2000—weeks before the SEC indicated acceptance of SeraNova's spin-off registration. Paragraph 2.10 is directed to the omission of material facts in the SPA or in SeraNova's Form 10. NSA's arguments for breach of this warranty are a subset of its contentions as to paragraphs 2.13 and 2.12—*i.e.*, the Form 10 omitted legally required facts and the SPA failed to disclose the terms of the PNC Bank loan. As such, any breach of paragraph 2.10 could not have delayed the spin-off beyond the delay flowing from breach of paragraphs 2.13 or 2.12—and, as discussed above, the breach of 2.13 effected a longer delay than any breach of 2.12.

### ORDER

Plaintiff's Motion for Summary Judgment of Liability for Breach of Contract on Count IV of its complaint (Docket No. 43) is *ALLOWED* with respect to the claim of a breach of the express warranty in para-

graph 2.13 of the Stock Purchase Agreement.