In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3378

SOUTHERN FINANCIAL GROUP, LLC,

*Plaintiff-Appellant,*

*v.*

MCFARLAND STATE BANK,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 12-CV-848 — **Nancy Joseph**, *Magistrate Judge.*

ARGUED MARCH 31, 2014 — DECIDED AUGUST 15, 2014

Before WOOD, *Chief Judge,* and WILLIAMS and HAMILTON,
*Circuit Judges.*

WOOD, *Chief Judge.* When sophisticated parties are able to
bargain, it is rarely unfair to hold them to their contract.
Southern Financial Group (SFG), a Texas firm specializing in
distressed-asset investing, bought a loan portfolio from
McFarland State Bank (McFarland) at cents on the dollar.
Both parties were well represented during negotiations over
the sale. The Loan Sale Agreement provided limited reme-

dies in the event of a breach and disclaimed all other reme-
dies. McFarland breached because one of its representations
about the status of the collateral was false. When notified
about the breach, McFarland disputed its liability. Months
later, SFG sued McFarland, seeking damages beyond the
limited remedies provided in the contract. Applying the con-
tractual remedies limitation, whose formula resulted in zero
recovery under the circumstances, the district court granted
judgment for McFarland. We affirm.

**I**

McFarland acquired several assets formerly owned by
the Evergreen State Bank. Among those assets was a loan
portfolio with an unpaid balance of $4.42 million. Later,
McFarland put this loan portfolio up at auction. A sophisti-
cated player in the distressed-loan business, SFG was inter-
ested in the portfolio. It accordingly consulted some back-
ground materials that McFarland's sales agent, Mission Cap-
ital, put together about the portfolio. Those materials indi-
cated that the portfolio was secured by 19 properties in Wis-
consin, all real estate. SFG purchased the loan portfolio for
$1.27 million (28.8% of the face value of the debt). In the
agreement for the sale of the loans (somewhat confusingly
called the Loan Sale Agreement by the parties), McFarland
represented that "no material portion of the Collateral was
released from the lien … and no instrument of release, can-
cellation or satisfaction was executed." Loan Sale Agmt
§ 6.2(h). SFG was represented by counsel throughout negoti-
ations leading to the purchase.

The Loan Sale Agreement limited available remedies in
the event of breach. First, it provided that "[n]either party
shall be liable to the other party for any consequential, spe-

cial or punitive damages." *Id*. § 6.3. In the event of McFarland's breach of a non-monetary obligation, the agreement provided the following sole remedy:

> If such breach or failure is not duly cured within [a] thirty (30) day period … then Seller [McFarland] shall elect, in its sole discretion to either (i) repurchase [the] Loan at the Repurchase Price, or (ii) pay to Buyer [SFG] the Buyer's actual damages directly caused by such breach, up to an amount not exceeding the Repurchase Price. The remedies set forth in this Section 6.3(b) shall be the exclusive remedies of the Buyer for any breach by Seller of a Non-Monetary Representation or Warranty, and the Buyer shall not be entitled to any other rights, remedies or other relief, at law or in equity, for Seller's breach of a Non-Monetary Representation or Warranty set forth in this Agreement.

*Id*. § 6.3(b). The agreement defined the term "Repurchase Price" to mean the purchase price, minus "all amounts … collected by [SFG] in respect of the Loans," minus any diminution in value of the loans attributable to SFG's fault, plus any reasonable costs incurred by SFG in maintaining the loans. *Id.*, art. I, pp. 4–5.

Shortly after purchasing the portfolio, SFG learned that three of the 19 collateral properties that supposedly secured the loans had been released before the sale. SFG contacted McFarland to notify it of this breach. After some correspondence, McFarland told SFG that, because it did not believe it was liable for any breach, it would not elect a contractual remedy. While the parties went back and forth discuss-

ing the alleged breach, SFG approved the sales of 13 of the remaining 16 collateral properties, netting proceeds of $1.31 million, slightly more than the purchase price for the entire portfolio. Three additional properties worth an estimated $320,000 in total remained in the portfolio. Months later, SFG filed this lawsuit, seeking damages totaling almost $387,000. This figure represented SFG's estimate of the profits it lost as a result of not having the three additional collateral properties in the portfolio.

The parties agreed to try the case before a magistrate judge. See 28 U.S.C. § 636(c)(1). The court found, and McFarland now accepts, that McFarland breached its contractual representations. But that was where SFG's success ended. The court concluded that the limited remedies provided in the contract were the sole remedies available for the breach. Under the contract, the greatest recovery SFG could obtain was the "Repurchase Price," a defined term. Because SFG already had obtained a gross return from the portfolio that exceeded its purchase price, the formula provided in the contract resulted in a Repurchase Price of less than zero. Accordingly, the court determined that SFG was not entitled to any (additional) remedy for the breach. The court rejected SFG's arguments that the limited remedy was unenforceable or waived, or that it failed of its essential purpose. It therefore granted summary judgment for McFarland. SFG appealed the judgment to this court.

## II

This is a straightforward case. The parties, represented by counsel, agreed to limit the remedies available for breach of their contract. Under the agreed limitations of this profitable bargain, SFG is entitled to nothing. Moreover, the rem-

edies limitation does not fail of its essential purpose, assuming that this inquiry is even appropriate in a contract for the sale of distressed loans. Finally, McFarland did not waive its right to insist on the remedies limitation when it disputed its liability for breach. We expand briefly on these points.

McFarland urges us to apply clear-error review to the court's finding that the agreement entitles SFG to nothing because SFG's profits exceed the purchase price. That finding, however, was not a determination of disputed facts or the characterization of undisputed facts. See *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373–74 (7th Cir. 1992). Instead, it was a question of contract interpretation based only on the text of the contract, and thus we give it a fresh look. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Similarly, we exercise *de novo* review over the question whether the limited remedy fails of its essential purpose. *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1006–07 (7th Cir. 1996). Our jurisdiction is based on diversity. 28 U.S.C. § 1332(a). Wisconsin law, which applies here, calls for us to interpret the contract in accordance with the parties' agreement. Loan Sale Agmt § 10.9; see also *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 576 (7th Cir. 1995).

Wisconsin permits the parties to agree to limit remedies for breach of contract and to disclaim consequential damages, provided the limitations are not unconscionable. *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 519–20 (Wis. 1978). In the Loan Sale Agreement, the parties agreed to disclaim all consequential, special, and punitive damages, and they established exclusive remedies for breach of non-monetary obligations. SFG does not argue that the damages limitation

in the contract is, on its face, unenforceable or unconsciona-ble under Wisconsin law.

The agreement provided three options for McFarland in the event of a non-monetary breach: (1) cure the breach; (2) reverse the transaction by paying the "Repurchase Price," as defined in the contract, in exchange for SFG's return of the loan portfolio; or (3) pay actual damages not to exceed the Repurchase Price. McFarland had "sole discretion" in elect-ing the remedy. The largest recovery SFG could hope to re-ceive was the Repurchase Price because, even if McFarland elected to pay damages, those damages could not exceed the Repurchase Price. That term was defined as the purchase price, less amounts SFG had "collected in respect of the loans" (minus losses attributable to SFG, plus SFG's mainte-nance costs, but those amounts do not affect the outcome here).

The breach at issue in this case was McFarland's inaccu-rate representation that none of the collateral purportedly securing the loan had been released. In fact, three pieces of collateral property already had been released at the time of sale. This was a non-monetary breach of the contract that en-titled SFG to one of the contractual remedies, at McFarland's election. But by the time the case reached the judgment stage, SFG had received through approved sales of collateral more money "in respect of the loans" than it paid to pur-chase the entire portfolio. Thus, applying the contractually agreed formula, the Repurchase Price was less than zero. Therefore, if the contractual remedies limitation is enforcea-ble, SFG is not entitled to any recovery for McFarland's breach.

We see no reason to reject the parties' allocation of risk, even if this means that SFG will be uncompensated for McFarland's breach. Wisconsin courts enforce agreements in which parties allocate risk in advance. See *Brooks v. Hayes*, 395 N.W.2d 167, 175 (Wis. 1986). SFG is a sophisticated, repeat player in the distressed-assets business. It could have negotiated a different contract had it wanted to shift more risk to McFarland. In that case, however, McFarland might have demanded more than 29 cents on the dollar for the portfolio. *Cf. Wis. Power & Light Co. v. Westinghouse Elec. Corp.*, 830 F.2d 1405, 1412 (7th Cir. 1987) (Wisconsin law) ("Wisconsin Power cannot accept the favorable purchase price and then disclaim the conditions underlying that price.").

Nor can we write the remedies limitation out of the contract for failure of essential purpose. See Wis. Stat. § 402.719(2) (codification of U.C.C. § 2-719(2)). First, the argument that the remedy fails of its essential purpose assumes that Wisconsin interprets U.C.C. Article 2, which governs the sale of goods, to apply to the purchase of a loan portfolio. Perhaps that is so. See Wis. Stat. § 402.102; *S&C Bank v. Wis. Cmty. Bank*, No. 2006AP2142, 747 N.W.2d 527, at 8 (Wis. Ct. App. Feb. 5, 2008) (unpublished) (citing Wisconsin U.C.C. Article 2 in discussion of warranties regarding sale of loan portfolio); see also *Dittman v. Nagel*, 168 N.W.2d 190, 193 (Wis. 1969) (applying "legal principles which have developed regarding express warranties as they apply to the sale of goods" to an express warranty regarding a sale of realty). We need not resolve the point, because the remedies limitation here does not fail of its essential purpose even if U.C.C. Article 2 applies.

In Wisconsin, "where [a] limited remedy fails of its essential purpose, the limitation will be disregarded and ordinary U.C.C. remedies will be available," including consequential damages. *Murray*, 265 N.W.2d at 520. A contractual remedy fails of its essential purpose "when the remedy is ineffectual or when the seller fails to live up to the remedy's provisions, either of which deprives the buyer of the benefit of the bargain." *Waukesha Foundry*, 91 F.3d at 1010. Although parties may limit damages remedies by contract, they must provide "at least a fair quantum of remedy for breach of obligations." *Phillips Petrol. Co. v. Bucyrus-Erie Co.*, 388 N.W.2d 584, 592 (Wis. 1986) (citing U.C.C. § 2-719, cmt. 1); see also *Murray*, 265 N.W.2d at 520 (limitations on remedies fail "where they would effectively deprive a party of reasonable protection against breach"). An unconscionable restriction, or one that operates to deprive a party of the substantial value of the bargain, fails of its essential purpose. U.C.C. § 2-719, cmt. 1.

SFG suggests that the agreed remedy fails of its essential purpose because it provides no relief to SFG in this case. But the fact that a limited remedy provides no relief in one set of circumstances does not mean the remedy fails of its essential purpose. Indeed, the whole point of limiting remedies is to make some remedies unavailable. See *Wis. Power*, 830 F.2d at 1413 ("[P]laintiffs cannot seriously contend that the contract failed of its essential purpose because they were denied a fair quantum of remedy when the remedy provided for in the contract was a product of their own making.") (quotation omitted). An agreed remedy does not fail of its essential purpose because it results in the party that bears the risk suffering the risk. Rather, it fails only where a party is unfairly deprived of the substantial value of its bargain. (It is important to note that even the U.C.C. does not assume that *all*

anticipated value of the bargain must be preserved; instead, it calls only for "minimum adequate remedies" that address the bargain as a whole. See U.C.C. § 2-719 cmt. 1.)

The application of the failure-of-essential-purpose rule in its usual sphere of sales of goods is illustrative. Many contracts for the sale of goods limit the buyer's remedies for breach of warranty to repair or replacement. See *Beal v. Gen. Motors Corp.*, 354 F. Supp. 423, 426 (D. Del. 1973) (from seller's perspective, the purpose is "to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise"); *Murray*, 265 N.W.2d at 520 ("The purpose of an exclusive remedy of repair or replacement, from the buyer's standpoint, is to give him goods which conform to the contract … substantially free of defects within a reasonable time after a defect is discovered.") (citing *Beal*). "The repair-and-replace remedy fails of its essential purpose when [the] seller is unable or unwilling to repair or replace in a reasonable time." Douglas Laycock, MODERN AMERICAN REMEDIES 72 (2010). Where the seller fails to honor the repair-or-replace remedy, the buyer loses the benefit of its bargain for the goods.

In this case, by contrast, the only reason that the contract provides SFG no remedy is that SFG already received substantial benefit from its bargain, even if not the full benefit it expected (because it was short three properties). Part of the overall bargain, however, was the clause limiting its remedies. The agreement allowed McFarland to pay back the purchase price less SFG's profits in exchange for return of the loan portfolio. The limited remedy, in other words, was rescission (or McFarland could pay a lesser amount in dam-

ages if it preferred). Nothing forced SFG to approve sales of
the collateral properties before McFarland repurchased the
portfolio. SFG could have held onto the properties, litigated
McFarland's liability for the breach and, using the definition
of Repurchase Price in the contract, collected money in con-
nection with the rescission. Instead, SFG decided to sell the
collateral and collect the profit. By its conduct, SFG showed
that it did not want the transaction rescinded. The contractu-
al remedy did not "effectively deprive [SFG] of reasonable
protection against breach," see *Murray*, 265 N.W.2d at 520,
nor was it "incapable of curing" the breach, *Waukesha Found-
ry*, 91 F.3d at 1010. Instead, SFG preferred to preserve the
imperfect transaction rather than accept the limited remedy
for which it negotiated.

SFG's reliance on *Resolution Trust Corp. v. Key Fin. Servs.,
Inc.*, 280 F.3d 12 (1st Cir. 2002), is unavailing. In *Key Financial*,
a repurchase remedy provided in a sale of a loan portfolio
failed of its essential purpose where the seller refused to re-
purchase the loans. But unlike the agreement here, the
agreement in *Key Financial* required the seller to repurchase
"upon demand" from the buyer. The latter agreement gave
the buyer, not the seller, the option to rescind the contract
when a breach was discovered. *Id.* at 18 n.14. The seller's
failure to repurchase on demand left the buyer holding the
bag as the value of the mortgages declined, thus pinning the
risk of losses on the buyer when the parties had agreed that
those losses would fall on the seller.

In this case, far from bearing any loss caused by the ina-
bility to rescind, the buyer SFG reaped profits from the
transaction that it would not have earned had the transaction
been rescinded. That is a far cry from the usual case in which

a limited remedy is found to fail of its essential purpose. *E.g. Phillips Petrol.*, 388 N.W.2d at 591–92 (limited remedy in sale of machinery failed of its essential purpose where extensive delay in making repairs left buyer unable to operate machinery for months); *Murray*, 265 N.W.2d at 521–23 (limited remedy in sale of motorhome failed of its essential purpose where motorhome had numerous defects that were not corrected); *Midwhey Powder Co., Inc. v. Clayton Indus.*, 460 N.W.2d 426, 430 (Wis. Ct. App. 1990) (genuine issue of fact whether seller's refusal to effect necessary repairs of generators caused limited warranty to fail of its essential purpose). Indeed, we are unaware of any case finding that a limited remedy failed of its essential purpose where the buyer benefitted from the transaction. Because SFG was not substantially deprived of the bargain's benefits, the contractual remedy does not fail of its essential purpose.

Finally, we reject SFG's contention that McFarland waived its right to insist on limited remedies when it did not immediately concede its breach. Unlike the contract in *Key Financial*, the contract here contained no express provision requiring McFarland to elect a remedy by any particular deadline, much less on demand. For breaches of non-monetary obligations, the contract provided that, "If [a] breach or failure is not duly cured within [a] thirty (30) day period … then [McFarland] shall elect, in its sole discretion," one of the provided remedies. Loan Sale Agmt § 6.3(b). This provision says nothing about when McFarland was required to make the election; rather it says only that the remedies became available if the breach was not cured within thirty days. By contrast, on the subject of breaches of monetary obligations, the agreement provided that, "[w]ithin [a] fifteen (15) day period, [McFarland] will pay to [SFG] all proper

and valid amounts due and owing." *Id*. § 6.3(c). The parties knew how to establish a deadline for providing a remedy, but they chose not to include one for breaches of non-monetary obligations.

Nor did McFarland's statement that it would not elect a remedy because it disputed its liability constitute an implied waiver of limited remedies. In the absence of specific contractual language to the contrary, a party does not waive its right to insist on contractual limited remedies by disputing its liability. *Cf. Jindra v. Diederich Flooring*, 511 N.W.2d 855, 857 (Wis. 1994) ("So long as the locus of liability remained uncertain, [the insurer]'s obligation was merely contingent and it had no legal obligation to make any payments under the [] policy."). McFarland raised colorable arguments that the alleged misrepresentation in the Loan Sale Agreement did not give rise to liability because SFG could have discovered whether any collateral had been released by reference to public documents. That meant, McFarland said, that there was no concealment. In addition, McFarland argued that SFG failed to provide timely notice and certain information necessary to McFarland's election of a remedy. Whether these arguments might ultimately have prevailed is immaterial. What matters is that McFarland raised genuine challenges to its liability. SFG could have avoided this problem by insisting that the agreement include a liquidated damages clause or provisions that immediately shifted the risk to McFarland. *Cf. Key Financial*, 280 F.3d at 18 n.14.

SFG contends that McFarland's failure to elect a remedy was a breach of an independent obligation in the agreement, and that this breach entitles SFG to a remedy. But that argument proves too much. Even if McFarland's failure to elect a

remedy were an independent breach, no damage resulted. As discussed above, had McFarland elected a remedy, the best that SFG could have hoped for was rescission. Had the contract been rescinded, SFG would have been required to return the loan portfolio in exchange for the Repurchase Price. As a result, SFG would not have profited from the transaction at all. The consequence of McFarland's failure to elect a remedy was that SFG made more money. Therefore, even if we were to accept SFG's argument that McFarland's failure to elect a remedy was an independent breach, SFG suffered no loss from that breach.

## III

Except in the most extraordinary circumstances, we hold sophisticated parties to the terms of their bargain. The terms of the parties' bargain in this case results in zero recovery for SFG. The judgment of the district court is AFFIRMED.