# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2072

_____

John Dubinsky, et al.,                    *
                                          *
            Plaintiffs-Appellants,        *
                                          *       Appeal from the United States
       v.                                 *       District Court for the Eastern
                                          *       District of Missouri.
Mermart, LLC,                             *
                                          *
            Defendant-Appellee.           *
                                          *
                                          *

_____

Submitted:  January 12, 2010
    Filed:  February 10, 2010

_____

Before GRUENDER and SHEPHERD, Circuit Judges, and JARVEY,[1] District Judge.

_____

JARVEY, District Judge.

John Dubinsky, William Stern, Alvin Siteman, Eldon Schoenberg, David Rasch, and Jack Cregan ("Subordinate Bondholders") invested in a refinancing venture for a real estate development. They sued the developer of the project, Mermart, L.L.C. ("Mermart"), alleging breach of contract and demanding equitable

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa, sitting by designation.

accounting for failure to pay interest under the financing documents, as well as alleging unjust enrichment, negligence, and fraudulent misrepresentation based on alleged representations that the project was free from environmental hazards. The district court[2] dismissed the contract claims, finding that the Subordinate Bondholders failed to obtain written consent of UMB Bank, N.A. ("UMB Bank"), the Senior Mortgagee, as required by the financing documents. The district court also dismissed the negligence, unjust enrichment, and fraudulent misrepresentation claims because the economic loss doctrine precluded recovery. For the following reasons, we affirm.

## I. BACKGROUND

In 2001, Mermart commenced a $47.3 million redevelopment of the historic Merchandise Mart Building in downtown St. Louis to convert the property into a mixed-use apartment and retail building. During the renovation, Mermart retained a third-party contractor to remove lead based paint found in the building. The renovation was complete in 2003 when the Missouri Department of Natural Resources issued a certificate of occupancy. In preparation for a later refinancing, Mermart hired Consulting Solutions, Inc. to conduct an independent environmental assessment report. This report, dated April 6, 2005, revealed the continued presence of lead paint and suggested that further remediation was necessary.

On Dec. 1, 2005, Mermart executed a Subordinate Trust Indenture ("Indenture") with itself as the borrower, the Industrial Development Authority of the City of St. Louis ("IDA") as issuers of the Series B subordinate bonds ("Series B bonds"), and UMB Bank as the Trustee. Together with the Indenture, Mermart also

---

[2]The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

completed a series of associated refinancing documents[3] (collectively, "Financing Documents") on the same day. The Financing Documents specified that UMB Bank would act as the Trustee for the Subordinate Bondholders and as the Trustee for the Senior Mortgagees, UMB Bank[4] and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The Subordinate Bondholders then purchased the Series B bonds from the IDA. The Series B bonds bore a fixed annual interest rate of 10 percent from January 15, 2006 to June 15, 2036, at which time the entire principal amount of $1.1 million was also due.

Beginning in 2007, as units became available, Mermart began to remediate the continued presence of the lead paint. Mermart characterized the cost of removal as an "upgrade" expense, rather than a capital expense. This allowed Mermart to deduct the removal costs from the funds available to the Subordinate Net Loan Operating Income ("SLNOI"), used to make the interest payments to the Subordinate Bondholders. On April 28, 2008, the Subordinate Bondholders notified UMB Bank that Mermart had committed an Event of Default under the Financing Documents by Mermart's failure to make the contractual interest payments. The Trustee, UMB Bank, responded to the Subordinate Bondholders on August 26, 2008 and declined to take legal action against Mermart.

---

[3]The other refinancing documents include: a Subordination Agreement; a Subordinate Loan Agreement; a Subordinate Multifamily Note; a Subordinate Multifamily Deed of Trust, Assignment of Rents, and Security Agreement; and an Assignment of Subordinate Security Instrument.

[4]UMB Bank served numerous roles in this transaction. For example, UMB Bank was a backer of the redevelopment venture in the guise of Senior Mortgagee, along with Freddie Mac. UMB Bank was also the trustee for senior bondholders, while concurrently the trustee to any subordinate interests, including the Subordinate Bondholders.

The Subordinate Bondholders, who own 51 percent of the bonds issued, thereafter brought this action seeking damages for breach of contract, equitable accounting, negligence, unjust enrichment, and fraud. Mermart filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), seeking dismissal because the Subordinate Bondholders failed to obtain the written consent of the Senior Mortgagee prior to bringing suit. Mermart asserted that the fraudulent misrepresentation claim was not pled with particularity, or, in the alternative, that the negligence, unjust enrichment, and fraudulent misrepresentation claims were precluded by the economic loss doctrine.

The district court granted Mermart's motion to dismiss in its entirety. At issue was whether section 707 of the Indenture controlled, which imposed no restrictions on bringing suit, or whether sections 4(b) and 5(c) of the Subordination Agreement required written consent of the Senior Mortgagee before filing suit. Dubinsky, et al. v. Mermart, L.L.C., 2009 WL 1011503, at *3 (E.D. Mo. Apr. 15, 2009). The court agreed with the latter interpretation, finding that the Subordinate Bondholders "were required under the financing documents to obtain the written consent of the Senior Mortgagee [UMB Bank] . . . [and] the action was filed without satisfying the applicable prerequisites contained within the financing documents." Id. at *4. The court added that "upon a finding that plaintiffs were restricted by the Subordination Agreement, the claims for an equitable accounting and breach of contract should be dismissed." Id.

Next, the court found separate and independent grounds for dismissal of the negligence, unjust enrichment, and fraudulent misrepresentation claims. The court held that the negligence claim was an issue "based on" the Financing Documents and was "precluded by the Subordination Agreement," again, because the Subordinate Bondholders did not first seek written consent to file a claim, and also because the negligence claim was precluded by the economic loss doctrine. Id. at *5. The unjust enrichment claim failed for similar reasons. Id. at *6. Lastly, the court held that the

fraudulent misrepresentation claims failed because the alleged fraudulent misrepresentations did not "pertain to any matter outside of or collateral to the contracts." Id. at *7.

The Subordinate Bondholders appeal.

## II. DISCUSSION

We review de novo a motion to dismiss for failure to state a claim under Rule 12(b)(6). Ashley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009). To survive a motion to dismiss, a claim must have "facial plausibility when the plaintiff pleads a factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). We must take all facts alleged in the complaint as true, but "threadbare" assertions of a cause of action are insufficient. Charles Brooks Co. v. Ga. Pac., L.L.C., 552 F.3d 718, 721 (8th Cir. 2009).

At the outset, we must determine whether the Subordination Agreement required the Subordinate Bondholders to obtain the written consent of the Senior Mortgagee before bringing the enforcement action. The Subordinate Bondholders argue that this condition precedent to bringing enforcement actions under sections 4(b) and 5(c) of the Subordination Agreement applies only to the Subordinate Mortgagees and not to the Subordinate Bondholders. They argue that section 707(a) of the Indenture—which does not require written consent—details the procedure applicable to them for enforcement actions.

Mermart urges an interpretation that treats the Financing Documents as an interconnected set of contracts. Pursuant to this interpretation, Mermart would have us find that section 210 of the Indenture controls the Subordinate Bondholders' right

to bring suit, because the Subordination Agreement is the controlling document if there are any "conflicts or inconsistency" among the Financing Documents. To further buttress this argument, Mermart urges us to find that the terms "Subordinate Mortgagee" and "Subordinate Bondholder," as used in the Financing Documents, are in effect interchangeable with no discernable differences in meaning or the parties the terms represent.

Pursuant to Missouri law, a court must enforce a contract "as written and according to the plain meaning of the words in the contract when the contract is clear and unambiguous." Contract Freighters, Inc. v. Hunt Transp., Inc., 245 F.3d 660, 663 (8th Cir. 2001) (quoting Farmland Indus., Inc. v. Frazier-Parrott Commodities, 111 F.3d 588, 590 (8th Cir. 1997)). When faced with conflicting or ambiguous specific and general provisions in a contract, a court should enforce the more specific of the terms. Five Star Quality Care-MO, L.L.C. v. Lawson, 283 S.W.3d 811, 815 (Mo. Ct. App. 2009). The terms of a contract should be read as a whole to determine the intent of the parties, TAP Pharm. Prods., Inc. v. St. Bd. of Pharmacy, 238 S.W.3d 140, 143 (Mo. 2007), and "[t]he test for ambiguity is whether the disputed language is reasonably susceptible of more than one meaning when the words are given their plain meaning as understood by an average person." Rabius v. Brandon, 257 S.W.3d 641, 645 (Mo. Ct. App. 2008) (quoting Lacey v. St. Bd. of Registration for the Healing Arts, 131 S.W.3d 831, 839 (Mo. Ct. App. 2004)).

In this case, the Indenture and Subordination Agreement limit the rights and remedies available to the Subordinate Bondholders. For example, the Indenture states in section 210[5] that the bonds are subordinate to all senior financing instruments, and

---

[5]The indebtedness evidenced by the Bonds is and shall be subordinate in right of payment to the prior payment in full of all the indebtedness under the Senior Bonds, the Senior Agreement and the other Senior Loan Documents, to the extent and in the manner provided in the Subordination Agreement. . . . The rights and remedies of the

(continued...)

that the bonds are subordinate to the "extent and manner" provided for in the Subordination Agreement and all "rights and remedies . . . are subject to the restrictions and limitations [therein] set forth." Indenture, § 210. Yet sections 701, 703(a), and 707(a) then set forth the procedure in which an event of default may be remedied. Section 701[6] defines an Event of Default as a failure to pay any interest due on the bonds, provided there is a sufficient amount of money in the SLNOI. § 701(a). The Subordinate Bondholders may remedy[7] such default by submitting a written

---

[5](...continued)
holders and subsequent holders of Bonds under this Indenture are subject to the restrictions and limitations set forth in the Subordination Agreement.

Indenture, § 210. The Subordinate Loan Agreement also says that the "Indenture and this Loan Agreement are and shall be subject and subordinate in all respects . . . to the terms and conditions of the Subordination Agreement." Subordinate Loan Agreement, § 3.09.

[6]An Event of Default is defined as a failure to make

payment of any interest on the Bonds shall not be made when the same becomes due and payable, provided sufficient Subordinate Loan Available NOI has been deposited in the Bond Fund; . . . Notice of an Even of Default hereunder shall be promptly provided by the Trustee to the Senior Bonds Trustee, . . . .

Indenture, § 701(a).

[7] Section 703 provides for "Enforcement of Remedies" and section 707 restricts actions of individual bondholders.

Upon the happening and continuance of any Event of Default hereunder, but subject to the terms of the Subordination Agreement, then and in every such case the Trustee may proceed, and upon the written request of . . . the holders of not less than 51% in aggregate principal amount of the Bonds then Outstanding hereunder and receipt by the Trustee of

(continued...)

request to the Trustee to sue, with at least 51 percent of the bondholders joining, provided the bondholders provide satisfactory indemnity for expenses and fees. Indenture, §§ 703(a), 707(a).

The Indenture cannot be interpreted in isolation because it cross-references the Subordination Agreement and refers to that instrument as controlling. For example, section 4(b)[8] of the Subordination Agreement states that the Subordinate Mortgagee shall not bring action against or take any action concerning environmental matters,

---

[7](...continued)
indemnity satisfactory to it for its fees and expenses . . . shall, subject to the provisions of the Subordination Agreement proceed . . . to protect and enforce its rights and the rights of the Bondholders . . . .

Indenture, § 703(a).

No Bondholder shall have any right to institute any suit . . . unless (i) such Bondholder previously shall have given the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted; (ii) the holders of not less than 51% of the Bonds then Outstanding shall have made written request of the Trustee . . . and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers hereinabove granted . . . , and (iii) there shall have been offered to the Trustee reasonable security and indemnity against the costs . . . , and the Trustee shall have refused or neglected to comply with such request within a reasonable time; . . . .

Indenture, § 707(a).

[8]Without the prior written consent of the Senior Mortgagee in each instance, the Subordinate Mortgagee shall not . . . (v) appear in, defend or bring any action to protect the Subordinate Mortgagee's interest in the Mortgaged Property, or (vi) take any action concerning environmental matters affecting the Mortgaged Property.

Subordination Agreement, § 4(b).

unless it has the prior written consent of the Senior Mortgagee. Section 5(c)[9] then states that the Subordinate Mortgagee may not commence an action until there has been notice of the intent to commence a legal suit and the Senior Mortgagee gives written consent. These terms are not "susceptible of more than one meaning," but rather supplement the enforcement procedure in the Indenture. Rabius, 257 S.W.3d at 645. Furthermore, this section states that the Senior Mortgagee has the "sole and absolute discretion" to decide whether to grant permission to sue,[10] which is a fair and reasonable limitation among sophisticated parties because the senior debtholders granted consent to allow subordinate debtholders. We interpret the Financing Documents as a whole and find that sections 4(b) and 5(c) of the Subordination Agreement provide that the Senior Mortgagee must give written consent to sue. See TAP Pharm. Prods., Inc., 238 S.W.3d at 143. Thus, these sections supplement the procedure set forth in section 707 of the Indenture; after the Subordinate Bondholders provide written notice to sue and satisfactory indemnity, sections 4(b) and 5(c) of the Subordination Agreement then impose limitations on the Subordinate Bondholders' unilateral ability to proceed with a lawsuit.

The Subordinate Bondholders assert that the maxim of *expressio unius est exclusio alterius* applies, meaning that the expression of one thing is to the exclusion of another. Am. Life Ins. Co. v. Barrett, 847 S.W.2d 125, 133 (Mo. Ct. App. 1993). In this case, the Subordinate Bondholders assert, therefore, that the omission of the

---

[9]The Subordinate Mortgagee may not proceed with an Enforcement Action until the Subordinate Mortgagee has given the Senior Mortgagee an "Enforcement Action Notice," and "the Senior Mortgagee has delivered to the Subordinate Mortgagee the Senior Mortgagee's written consent to such Enforcement Action by the Subordinate Mortgagee." Subordination Agreement, § 5(c).

[10]It even provides that such permission can be withheld arbitrarily. "The Subordinate Mortgagee acknowledges that the Senior Mortgagee may grant or refuse consent [with] . . . sole and absolute discretion, and that such discretion may be exercised in an arbitrary manner." Subordination Agreement, § 5(c).

term "Subordinate Bondholders" from the Subordination Agreement was intentional and that any sections not explicitly referring to "Subordinate Bondholders"—for example, those referring to "Subordinate Mortgagees"— should not apply to them. We note that the Subordination Agreement refers to the bondholders as "Subordinate Mortgagees," with this term defined as the "legal holder of the Subordinate Note" or the Series B bonds.[11]  Courts should reject the interpretation of a contract that leads to "unreasonable results when probable or reasonable construction can be adopted." Stonebrook Estates, L.L.C. v. Greene County, 275 S.W.3d 353, 355 (Mo. Ct. App. 2008) (quoting Blackburn v. Habitat Dev. Co., 57 S.W.3d 378, 386 (Mo. Ct. App. 2001)).

If we find that the Senior Mortgagee must give written consent to suit, then the Subordinate Bondholders claim that section 707(a) of the Indenture is rendered meaningless, and "[a] construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense."  Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003) (citing City of Harrisonville v. Public Water Supply Dist. No. 9 of Cass County, 49 S.W.3d 225, 231 (Mo. Ct. App. 2001)).  We find that

---

[11]The Preamble to the Subordination Agreement states,

> THIS SUBORDINATION AGREEMENT (this "**Agreement**") is entered into as of the 1st day of December, 2005, by and between (i) . . . ("**Freddie Mac**") (ii) **UMB BANK, N.A.**, a national banking association, as trustee (the "**Bond Trustee**") and together with Freddie Mac, the "**Senior Mortgagee**"), (iii) **UMB BANK, N.A.**, a national banking association, as trustee for the Series B Bonds (as hereinafter defined) (the "**Subordinate Mortgagee**").

Subordination Agreement, pmbl. (emphasis in original).  The Definitions section also defines "Subordinate Mortgagee" as the "person or entity named as such in the first paragraph of this Agreement and any other person or entity who becomes the legal holder of the Subordinate Note after the date of this Agreement."  Id. at 1(n).

such an interpretation does not render section 707(a) meaningless. Sections 703 and 707(a) establish the procedure for the Subordinate Bondholders to bring notice of an event of default to UMB Bank, and this right of the Subordinate Bondholders is not abridged in any way by the Subordination Agreement. Instead, when read together, the Subordination Agreement limits the power of the Subordinate Trustee/Mortgagee to bring suit against the Senior Mortgagee because it requires that the Senior Mortgagee must give written consent to be sued. This unequivocal consent requirement serves to protect the superior interests of the senior bondholders in the property over the subordinate interests.

Thus, we conclude that the Subordination Agreement required the Subordinate Bondholders to obtain the written consent of the Senior Mortgagee before bringing the enforcement action. The district court properly dismissed the breach of contract and accounting claims.

The Subordinate Bondholders have raised for the first time on appeal the argument that the written consent to suit is unconscionable as applied. We decline to address this argument as it was not raised in the lower court. "Absent exceptional circumstances we will not consider arguments raised for the first time on appeal." McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005). See also Cole v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., 533 F.3d 932, 936 (8th Cir. 2008); Data Mfg., Inc. v. United Parcel Serv., Inc., 557 F.3d 849, 854–55 (8th Cir. 2009). We find no exceptional circumstances here.

The Subordinate Bondholders next assert that separate and independent state claims for relief lie in tort, including the claims of negligence, unjust enrichment, and fraudulent misrepresentation. Mermart counters that the these claims are barred by the written permission to suit requirement and, alternatively, because the negligence and unjust enrichment claims arise solely under the Financing Documents and are purely economic losses. The economic loss doctrine bars "recovery of purely

-11-

pecuniary losses in tort where the injury results from a breach of a contractual duty." Zoltek Corp. v. Structural Polymer Group, Ltd., 2008 WL 4921611, at *3 (E.D. Mo. 2008), aff'd on other grounds, No. 08-3928, 2010 WL 273957 (8th Cir. Jan. 26, 2010).

We begin by addressing the negligence and unjust enrichment claims. The district court dismissed the negligence claim as it "is precluded by the Subordination Agreement because plaintiff did not obtain the consent of the Senior Mortgagee prior to filing a claim based on the financing documents." Dubinsky, 2009 WL 1011503, at *5. We agree with the district court that the negligence claim is an enforcement action under the Subordination Agreement. Id. Similarly, we find that, like the negligence claim, the failure to make interest payments due to the characterization of the lead paint remediation as an "upgrade expense," is a matter that arises out of the Financing Documents. The Subordinate Bondholders assert that Mermart's miscalculation of the cost of lead based paint removal deprived them of interest payments, thereby unjustly enriching Mermart. Yet the district court was correct in concluding that the Subordinate Bondholders' "unjust enrichment claim seeks recovery for events arising solely out of the financing documents" and that all alleged instances of representations "concerning the presence or absence of lead based paint is contained exclusively within the contracts themselves." Id. at *5–6. Thus, we need not reach the issue of the economic loss doctrine. We affirm the dismissal of the negligence and unjust enrichment claims because the Subordinate Bondholders did not obtain written permission to sue.

Finally, the Subordinate Bondholders argue that Mermart made fraudulent misrepresentations pertaining to the absence of lead-based paint. Mermart counters that any such alleged statements are also covered solely by contractual duties. "A fraud claim is permitted only if it arises from acts that are separate and distinct from the contract." O'Neal v. Stifel, Nicolaus & Co., Inc., 996 S.W.2d 700, 702 (Mo. Ct. App. 1999) (citing Bernoudy v. Dura-Bond Concrete Restoration, Inc., 828 F.2d 1316,

1318 (8th Cir. 1987)).  Mermart represented that it "shall not cause or permit . . . any violation or noncompliance" with environmental hazards, including lead-based paint. Subordinate Multifamily Deed of Trust, § 18(a)(v).  Here, we find that the claimed fraudulent misrepresentation is also a matter that arises out of the Financing Documents.  Again, we affirm the dismissal of this claim because the Subordinate Bondholders did not first obtain the written permission from the Senior Mortgagee to sue.

## III. CONCLUSION

Because we conclude that the district court did not err in granting the motion to dismiss, we affirm.

_____