# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1375

_____

CitiMortgage, Inc.

*Plaintiff - Appellee*

v.

Chicago Bancorp, Inc.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 21, 2015
Filed: December 21, 2015

_____

Before WOLLMAN, COLLOTON, and KELLY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

CitiMortgage, Inc. (CMI) and Chicago Bancorp, Inc. (Bancorp) entered into a contract under which CMI agreed to buy residential mortgage loans underwritten or originated by Bancorp, and Bancorp agreed to cure or repurchase any such loan that CMI, in its "sole and exclusive discretion," determined did not conform with the terms of the contract. After Bancorp refused to cure or repurchase eleven loans, CMI

filed this breach-of-contract suit. The district court[1] concluded that Bancorp had breached the contract by refusing to cure or repurchase eight of the eleven loans, and it granted CMI's motion for summary judgment with respect to those loans.[2] Bancorp appeals, and we affirm.

CMI purchases mortgages originated or underwritten by certain approved lenders, including Bancorp, and resells most of those loans to the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), or other investors in the secondary mortgage market. In 2004, CMI and Bancorp entered into CMI's standard "Correspondent Agreement Form 200" (the agreement), which set forth the terms and conditions governing Bancorp's sale of loans to CMI and incorporated CMI's, as well as Fannie Mae's, detailed guidelines for analyzing borrower and property data (CMI Manual). The agreement required Bancorp to cure or repurchase any loan it sold to CMI if CMI, in its "sole and exclusive discretion," determined (1) that the loan had been "underwritten and/or originated in violation of any term, condition, requirement or procedure contained in" the agreement or the CMI Manual; (2) that the loan had been "underwritten and/or originated based on any materially inaccurate information or material misrepresentation" by a borrower or by Bancorp; or (3) that the loan had to "be repurchased [by CMI] from any secondary market investor" as a result of Bancorp's failure to comply with any requirement set forth in the agreement or the CMI Manual. Add. of Appellant 64.

---

[1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

[2]The district court denied summary judgment on three of the loans originally identified by CMI, and it later granted CMI's motion to dismiss with prejudice the claims related to those loans.

From 2004 to 2009, Bancorp sold more than 4,700 loans to CMI under the agreement. Based on internal reviews or third-party reports, CMI determined that eleven of those loans were defective under the terms of the agreement. CMI forwarded notice of its determination to Bancorp, demanding that Bancorp cure or repurchase the defective loans. When Bancorp refused, CMI filed suit to recover the repurchase price, as set forth in the agreement. As stated above, the district court granted summary judgment to CMI on eight of the eleven loans (the Bennett, Brown, Curtis, Hansen, Maggio, Miller, Perez, and Villares loans). Applying Missouri law and considering the plain language of the agreement and the undisputed evidence, the district court concluded that Bancorp had breached the agreement by failing to cure or repurchase the eight loans at issue. The court further concluded that Bancorp failed to establish that CMI acted in bad faith, either in its determination that those loans were defective under the agreement or in its subsequent treatment or disposition of the underlying properties. CMI voluntarily dismissed its claims on the remaining three loans (the Gelatka, McDonald, and Wade loans) with prejudice, and the court entered final judgment, awarding CMI $1,283,068.07 under the agreement's repurchase price formula.

Bancorp argues on appeal that summary judgment was inappropriate because there were genuine issues of material fact regarding CMI's good faith in determining the materiality of the alleged misrepresentations or inaccuracies in the Brown, Hansen, Maggio, and Perez loan applications and in the calculation of the amount of damages due on the Bennett and Brown loans.[3] Bancorp also argues that the district court erred in concluding that it was obligated to cure or repurchase the Curtis, Maggio, and Villares loans, because CMI was the underwriter of those loans and was thus responsible for any misrepresentations or inaccuracies in those loans.

---

[3]Bancorp does not appeal the district court's order with respect to the Miller loan.

We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party, and affirming if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Residential Funding Co. v. Terrace Mortg. Co., 725 F.3d 910, 915 (8th Cir. 2013). To establish a genuine issue of material fact, a party must provide sufficient probative evidence to permit a finding in its favor. Id.

Bancorp first asserts that there were genuine issues of material fact regarding whether CMI made a good-faith determination that the misrepresentations or inaccuracies included in the loan applications of borrowers Brown (misrepresented income and impermissible debt-to-income ratio), Hansen (misrepresented employer), Maggio (misrepresented income and impermissible debt-to-income ratio), and Perez[4] (undisclosed second mortgage on undisclosed additional property) were "material" under the terms of the agreement. CMI responds that Bancorp's arguments are foreclosed by our decision in Residential Funding, in which a buyer of residential mortgage loans brought a breach-of-contract claim when the seller refused to repurchase loans deemed defective by the buyer. The parties' agreement granted the buyer sole discretion to determine whether a loan was defective and required the seller to repurchase if the buyer made such a determination. The seller had the right to appeal the buyer's defectiveness determination, but the buyer also retained the sole discretion to determine the validity of any such appeal. We first noted that under Minnesota law, a court interpreting a contract must "attempt to determine the intent

---

[4]CMI sold the Perez loan to Fannie Mae, which later discovered the misrepresentation and demanded that CMI repurchase the loan. CMI argued against its own obligation to repurchase from Fannie Mae, but that fact alone is insufficient to establish CMI's bad faith. See, e.g., BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 914 (8th Cir. 2007) (concluding under Missouri law that proof of "flawed or unreasonable" discretionary decision is insufficient; bad faith requires proof that discretionary decision was intended "to evade the spirit of the transaction or . . . to deny [the other party] the expected benefit of the contract" (citation omitted)).

of the parties . . . from the language of the contract." Id. at 916 (citations omitted). And when the language in a contract is unambiguous, "courts should not rewrite, modify, or limit its effect." Id. (citation omitted).

We went on to hold that because the operative language of the agreement was clear and unambiguous, we were not entitled to look beyond the agreement's terms. We noted that the agreement was "freely negotiated . . . between two sophisticated parties" and that the seller "willingly agreed to place itself in this situation[,] . . . had the opportunity to obtain advice from able counsel, and made its own decision to enter into the contract." Id. at 917. We reasoned that the seller could not "contract away judicial review by granting [the buyer] the exclusive right to determine" whether a loan was defective, "only to later ask a court to independently review [the buyer's] determination." Id. at 915-16.

In reaching this conclusion, we acknowledged that Minnesota courts imply a covenant of good faith in every contract, which prevents a party from "unjustifiably hinder[ing] the performance of another party" or from refusing to fulfill a contractual obligation "based on an ulterior motive." Id. at 917-18. But we rejected the seller's allegations that the buyer acted in bad faith in determining that specific loans were defective, because "[a] party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights." Id. at 918 (citation and quotation marks omitted). In other words, the buyer "did exactly what the contract allowed it to do," namely, determine that a loan was defective and demand repurchase. Id. We refused to consider the seller's arguments of bad faith related to specific loans, because it was undisputed that the buyer determined that those loans were defective under the agreement, a determination left to its sole and absolute discretion. We concluded that for the court "[t]o inquire further by reviewing the validity of" that determination would "contradict unambiguous contract language" in violation of Minnesota law. Id. at 920.

We conclude that Residential Funding controls our analysis here. Like Minnesota courts, Missouri courts interpret a contract to give effect to the parties' intent and, when a contract is unambiguous, intent "is discerned solely from the contract's language." The Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr. Co., 464 S.W.3d 177, 183 (Mo. 2015). Under Missouri law, as under Minnesota law, a covenant of good faith and fair dealing is implied in every contract, but "there can be no breach of the implied . . . covenant . . . where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." Id. at 185 (citations omitted). Similarly, under both Missouri and Minnesota law, the implied covenant is breached only if a party "exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the [other party] the expected benefit of the agreement." Glenn v. HealthLink HMO, Inc., 360 S.W.3d 866, 877 (Mo. Ct. App. 2012); see Minnwest Bank Cent. v. Flagship Props. LLC, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004) (noting that the implied covenant "bars a party from unjustifiably hindering the other party's performance"). Likewise, when there has been "no subterfuge," and the contract's "express terms" allowed for the challenged action, there is no bad faith and thus no breach of the implied covenant. The Arbors, 464 S.W.3d at 185; see Minnwest Bank Cent., 689 N.W.2d at 303 (noting that to prove a violation of the implied covenant, "a party must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty").

Like the buyer in Residential Funding, CMI had "sole and exclusive discretion [to] determine" whether a loan was defective, including whether it was "based on any materially inaccurate information or material misrepresentation." Add. of Appellant 64. CMI and Bancorp, two sophisticated business entities, voluntarily negotiated and entered into the agreement, and there is nothing ambiguous about the language used therein. Like the seller in Residential Funding, Bancorp challenges the accuracy, materiality, and good faith of CMI's loan-defectiveness determinations. Although the

-6-

district court engaged in a loan-by-loan analysis to decide that CMI exercised its discretion in good faith, we conclude that Residential Funding precludes such a consideration. Our holding in Residential Funding is fatal to Bancorp's allegations that CMI exercised its unfettered discretion under the agreement in bad faith, because, like the buyer in that case, CMI "did exactly what the contract allowed it to do" in determining whether Bancorp's loans were defective, and CMI did "not act in bad faith by asserting or enforcing its legal and contractual rights." Residential Funding, 725 F.3d at 918 (citation omitted). "To inquire further by reviewing the validity of [CMI's defectiveness] determination [would be to] contradict unambiguous contract language," something Missouri law does not allow us to do. Id. at 920.

And even if CMI erroneously exercised its "sole and exclusive discretion" under the contract, Bancorp has not provided evidence to establish that CMI acted in bad faith. It is not enough "to show that a party invested with discretion made an erroneous decision." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 914 (8th Cir. 2007) (interpreting Missouri law). Rather, Bancorp was required to provide evidence that CMI exercised its discretion in a way intended "to evade the spirit of the transaction or . . . to deny [Bancorp] the expected benefit of the contract." Id. (noting that it is insufficient to provide evidence that a discretionary determination "was flawed or unreasonable") (citation omitted); see also Armour & Co. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993) (noting that "[c]onclusory affidavits do not provide a basis upon which to deny motions for summary judgment").

Bancorp has presented no evidence that CMI exercised its discretion under the agreement in a manner intended to sabotage or evade the spirit of the agreement or to deny Bancorp the expected benefit of its bargain. See BJC Health Sys., 478 F.3d at 914 (noting that the burden of proof is on the party asserting a bad-faith exercise of discretion). Accordingly, we conclude that the district court did not err in granting summary judgment on the Brown, Hansen, Maggio, and Perez loans. CMI exercised its sole and absolute discretion under the unambiguous language of the agreement to

-7-

determine that each of these loans was based on a material misrepresentation or inaccuracy and was thus defective. Bancorp has provided no evidence that CMI exercised its discretion in a manner that was intended to "evade[] the spirit of the agreement and den[y] [Bancorp] the expected benefit of the agreement." Glenn, 360 S.W.3d at 877. Bancorp "willingly agreed to place itself in this situation" by granting CMI sole and exclusive discretion to determine the defectiveness of any loan purchased from Bancorp—the very determinations that it now seeks to challenge. See Residential Funding, 725 F.3d at 917.

Bancorp next argues that the district court erred in granting summary judgment in favor of CMI on the Bennett and Brown loans because genuine issues of material fact exist with respect to the appropriate calculation of the repurchase price under the agreement.[5] Bancorp contends that CMI unreasonably delayed in disposing of these properties by specifically refusing to approve a deed in lieu of foreclosure or a short sale that would have limited the decline in the properties' value and the resulting repurchase price. Bancorp argues that CMI's conduct and the resulting increase in the repurchase price was not reasonably foreseeable to Bancorp and was a violation of CMI's duty to mitigate damages.

The "Cure or Repurchase" section of the agreement states that if Bancorp is unable to cure a defective loan, Bancorp must repurchase that loan at the "Repurchase Price," which is defined as the sum of:

---

[5]To the extent Bancorp argues that a genuine issue of material fact exists regarding whether CMI unreasonably failed to mitigate damages on the Brown loan because CMI ceded title to the underlying property to the City of Chicago after fire and vandalism damage to the dwelling prompted the City to raze it, Bancorp failed to raise this argument before the district court, and we will not consider it for the first time on appeal. See Dubinsky v. Mermart, LLC, 595 F.3d 812, 819 (8th Cir. 2010).

(i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan[;] (iv) any price paid in excess of par by [CMI] on the funding date[;] and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

Suppl. App'x of Appellee 84. Bancorp does not argue that this language is ambiguous or that CMI's calculations under this formula were erroneous with respect to the Bennett and Brown loans. Instead, it contends that the legal doctrines of foreseeability, mitigation, and good faith apply to modify this language; that CMI failed to mitigate the amount of the repurchase price due on these loans in violation of the implied covenant of good faith and fair dealing; and that Bancorp is not liable for the full repurchase price because the amount of the repurchase price on these loans was not reasonably foreseeable when the parties entered into the agreement. The district court rejected this argument. It observed that "CMI's feet-dragging" in disposing of the underlying properties "may have led to increased damages" but nevertheless concluded that the repurchase price provision was "the measure the parties agreed to. The damages incurred . . . were not unforeseeable; rather, they were explicitly bargained for." Add. of Appellant 45. We agree.

The agreement was the result of an arm's length negotiation between two sophisticated commercial entities. By entering into it, Bancorp knowingly accepted the risk set forth by the plain language therein, namely, that the amount of the repurchase price on a defective loan could increase if Bancorp refused to cure or repurchase the loan in accordance with the terms of the agreement. Had Bancorp repurchased these loans at the time of CMI's initial demand, the questions of

foreseeability and mitigation would not have arisen.  See Resolution Tr. Corp. v. Key Fin. Servs., Inc., 280 F.3d 12, 18 & n.14 (1st Cir. 2002) (applying New York law to a similar provision, declining to apply damage-limiting legal doctrines and noting that the provision was "designed to shift the risk to the selling party in the event that a dispute arises," making it "irrelevant that the loans may have suffered a loss in value because of changing market conditions rather than" deficiencies in the loans themselves); see also S. Fin. Grp., LLC v. McFarland State Bank, 763 F.3d 735, 742 (7th Cir. 2014) (noting that when the seller in Key Financial failed to repurchase on demand, the buyer was left "holding the bag as the value of the mortgages declined, thus pinning the risk of losses on the buyer when the parties had agreed that those losses would fall on the seller").

The agreement obligated Bancorp to repurchase defective loans on demand, thus "from the moment a proper repurchase demand was made, [Bancorp]—not [CMI]—should have borne the risk of any market fluctuations." Key Fin. Servs., Inc., 280 F.3d at 18 n.14.  As the district court noted, the parties explicitly bargained for and agreed to the formula set forth in the repurchase price provision, and the amounts calculated thereunder were not unforeseeable. See Add. of Appellant at 45; see also CitiMortgage, Inc. v. Allied Mortg. Grp., Inc., 4:10CV1863, 2012 WL 5258745, at *13 (E.D. Mo. Oct. 24, 2012) ("By entering into the [loan-repurchase] Agreement, Allied consented to this method of calculating CMI's damages based upon application of the Repurchase Price formula set forth in . . . the Agreement"); CitiMortgage, Inc. v. Reunion Mortg., Inc., 4:10CV1632, 2012 WL 5471165, at *13 (E.D. Mo. Nov. 9, 2012).  "The kind of 'reasonableness' argument[s] for which [the defendant] grasps [are] not present in the language of the contract. . . . [T]he district court correctly relied on the language of the contract that these parties freely signed." Residential Funding, 725 F.3d at 922.  The damage-limiting doctrines cited by Bancorp do not trump the plain, unambiguous, and bargained-for language of the agreement.  Bancorp's "cries of injustice fall on deaf ears, as [it] freely contracted for the obligations by which it now finds itself bound." Key Fin. Servs., Inc., 280 F.3d

at 18.  The district court properly awarded CMI the repurchase price for the Brown and Bennett loans, as calculated using the formula set forth in the agreement.

Finally, Bancorp argues that summary judgment was improper on the Curtis, Maggio, and Villares loans because there is a genuine issue of material fact regarding which party's negligent underwriting caused the loans to be defective.  Bancorp, the originator of these loans, argues that because CMI was the underwriter, CMI was responsible for verifying employment and income information on these loans.  Here again, the language of the agreement is clear and unequivocal—Bancorp was required to cure or repurchase a loan if CMI, in its sole and exclusive discretion, determined that any loan was "underwritten *and/or* originated" based on any materially inaccurate information or misrepresentation.  Add. of Appellant 64 (emphasis added).  Bancorp originated these loans, and CMI exercised its discretion in determining that they were originated based on material misrepresentations.  The district court thus did not err in granting summary judgment on these loans.

The judgment is affirmed.

———————————————