# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1312

_____

CitiMortgage, Inc.

*Plaintiff - Appellant*

v.

Equity Bank, N.A.

*Defendant - Appellee*

_____

No. 18-1313

_____

CitiMortgage, Inc.

*Plaintiff - Cross Appellee*

v.

Equity Bank, N.A.

*Defendant - Cross Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 17, 2019
Filed: November 6, 2019

_____

Before LOKEN, GRASZ, and STRAS, Circuit Judges.
_____

STRAS, Circuit Judge.

This appeal involves a dispute over twelve residential-mortgage loans that CitiMortgage, Inc. purchased from Equity Bank, N.A. After discovering problems with the loans, CitiMortgage demanded that Equity repurchase them and then sued when Equity refused. A magistrate judge,[1] acting by consent of the parties, ruled that Equity's duty to repurchase was limited to the six loans that had not gone through foreclosure. We affirm.

I.

Over the years, CitiMortgage purchased hundreds of residential-mortgage loans from Equity. Rather than negotiate a new deal each time, the parties entered into one overarching contract (the "Agreement"). Generally speaking, the Agreement placed the risk of loss on Equity by requiring it to abide by a long list of representations and warranties, granting CitiMortgage the "sole and exclusive discretion" to identify defects in the loans, and giving CitiMortgage considerable rights if it did. In fact, the Agreement made clear that CitiMortgage had no obligation to review the loans, either at the time of purchase or at any point thereafter, and that its "review of, or failure to review, all or any portion of the Loan documentation [would] not affect" its rights.

_____

[1]The Honorable Shirley Padmore Mensah, United States Magistrate Judge for the Eastern District of Missouri, to whom this case was referred for final disposition under 28 U.S.C. § 636(c).

For the twelve loans at issue here, CitiMortgage notified Equity of the defects in writing. It informed Equity that it needed to take action under the Agreement's "cure-or-repurchase" provision, which obligated Equity to

> correct or cure [the] defect within the time prescribed by [CitiMortgage] to the full and complete satisfaction of [CitiMortgage]. If, after receiving . . . notice from [CitiMortgage], [Equity] [wa]s unable to correct or cure such defect within the prescribed time, [Equity] had to], at [CitiMortgage's] sole discretion, either (i) repurchase such defective Loan from [CitiMortgage] at the price required by [CitiMortgage] ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as [CitiMortgage] . . . deem[ed] appropriate.

By the time CitiMortgage demanded that Equity buy back six of the loans, the mortgages securing them had already been through foreclosure.

When Equity refused to act, CitiMortgage sued. Both sides requested summary judgment, and the magistrate judge analyzed the loans differently based on whether foreclosure had occurred. For the six in which it had not, the judge ruled that Equity breached the Agreement. For the other six, however, the judge determined that Equity owed nothing to CitiMortgage. Equity and CitiMortgage both appeal the portions of the decision that they lost and raise issues of contractual interpretation that we review de novo. *See Hudson Specialty Ins. Co. v. Brash Tygr, LLC*, 769 F.3d 586, 590 (8th Cir. 2014).

II.

The Agreement contained a Missouri choice-of-law provision that the parties acknowledge applies here. *See BancorpSouth Bank v. Hazelwood Logistics Ctr., LLC*, 706 F.3d 888, 893 (8th Cir. 2013). Our task is to interpret the Agreement by examining "the plain and ordinary meaning of the language used" to determine the

parties' obligations, both for the loans that had gone through foreclosure and those that had not. *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 846 (Mo. banc 2012) (internal quotation marks and citation omitted).

## A.

We address the latter category first. Equity does not dispute that all six loans in this group were defective and that it refused to cure or repurchase them. Rather, it argues that CitiMortgage's letters lacked the necessary detail to trigger its duty to perform and that CitiMortgage waited too long to exercise its rights. On both points, we disagree.

Equity insists that it did not need to act because CitiMortgage's letters never specified the repurchase prices of any of the loans, which it characterizes as a condition precedent to its own performance. It is true that CitiMortgage's letters omitted the repurchase prices. Even so, Missouri law "does not favor conditions precedent and courts will not construe contract provisions" to include them "unless required to do so by plain, unambiguous language or by necessary implication." *Kan. City S. Ry. Co. v. St. Louis-S.F. Ry. Co.*, 509 S.W.2d 457, 460 (Mo. 1974). The cure-or-repurchase provision did not contain *any* language suggesting that inclusion of the repurchase price was necessary to trigger Equity's obligation to perform, much less include typical "conditional language such as 'provided that' or 'on condition.'" *James E. Brady & Co. v. Eno*, 992 F.2d 864, 869 (8th Cir. 1993) (citation omitted). If disclosure of the repurchase price was not a condition precedent to Equity's performance, then Equity had to hold up its end of the bargain.

Equity's other line of argument is that CitiMortgage delayed too long before acting, first by waiting before demanding that Equity repurchase the loans and later by failing to sue in a timely fashion. CitiMortgage took its time, to be sure, waiting more than two years in some cases to demand action from Equity. But nothing in the Agreement required it to act any sooner.

-4-

The Agreement itself did not require CitiMortgage to exercise its rights any more swiftly under the cure-or-repurchase provision than it did. It is true that, in the face of contractual silence, courts will sometimes presume that an option or a right "must be exercised within a reasonable time." *Venture Stores, Inc. v. Pac. Beach Co.*, 980 S.W.2d 176, 183 (Mo. Ct. App. 1998) (per curiam) (internal quotation marks and citation omitted); *see also Magee v. Mercantile-Commerce Bank & Tr. Co.*, 124 S.W.2d 1121, 1124–25 (Mo. 1938); *Weis v. Wanstrath*, 149 S.W.2d 442, 445–46 (Mo. Ct. App. 1941). But we must also be "leery of imposing time limits" when there is evidence that the "parties to the contract bargained" against them. *Venture Stores*, 980 S.W.2d at 183; *cf. Johnson v. Mo.-Kan.-Tex. R. Co.*, 216 S.W.2d 499, 502 (Mo. 1949) (looking for a "satisfactory basis in the express contract . . . to imply certain duties and obligations" (citation omitted)).

Three provisions in the Agreement suggest that the parties bargained against a reasonable time limitation. First, CitiMortgage was assigned the "sole and exclusive discretion" to determine whether a loan was defective. Second, the Agreement contained a no-waiver-of-rights clause, which provided that "the failure of either party to exercise any [contractual] right" did not constitute "waiver" of any other right. Third, CitiMortgage had the right to "review . . . , or fail[] to review, all or any portion of the Loan documentation" without "affect[ing its] rights to demand repurchase."

The judicially imposed time limit that Equity seeks would affect these contractual rights. To determine when the clock started running might require a court to decide when a loan was defective enough to require repurchase—which would arguably invade CitiMortgage's "sole and exclusive discretion" to make the call itself. And delaying after discovering a defect would risk waiving CitiMortgage's right to demand repurchase, even though its review of the "Loan documentation" was not supposed to prejudice its rights. Implying a reasonable time limitation, in other words, would defeat the parties' bargained-for terms.

-5-

Equity responds that it should not have had to live with perpetual uncertainty after it sold the loans. Just because Equity now has second thoughts about the contract it signed with CitiMortgage, however, does not mean that we should rescue it from what may have turned out to be a bad deal. *See Venture Stores*, 980 S.W.2d at 183 ("[T]he freedom to contract includes the freedom to make bad decisions."); *cf. CitiMortgage, Inc. v. Chi. Bancorp, Inc.*, 808 F.3d 747, 754 (8th Cir. 2015) (noting that a similar "agreement was the result of an arm's length negotiation between two sophisticated commercial entities . . . [that] knowingly accepted the risk set forth by the plain language therein").

In a variation on its argument that CitiMortgage moved too slowly, Equity insists that this lawsuit came too late under Missouri's five-year statute of limitations. *See* Mo. Rev. Stat. §§ 516.100, .120(1). This argument turns on when CitiMortgage's claims accrued, because the record shows that CitiMortgage sued within five years after Equity refused to repurchase the loans. CitiMortgage's view is that then, and only then, did it suffer an "actual loss." *Spalding v. Stewart Title Guar. Co.*, 463 S.W.3d 770, 775–77 (Mo. banc 2015); *see also* Mo. Rev. Stat. § 516.100 ("[T]he cause of action . . . accrue[s] . . . when the damage resulting therefrom is sustained and is capable of ascertainment."). Equity's view, by contrast, is that CitiMortgage suffered a loss as soon as it purchased the defective loans.

The existence of the cure-or-repurchase provision itself is incompatible with Equity's position. By including it, the parties placed the risk on Equity, which had a contractual obligation to fix any disclosed defects. CitiMortgage could demand action at any time, including months or even years after it discovered a defect. But only when Equity refused to fulfill its repurchase obligation and make things right did CitiMortgage suffer an "actual loss."[2] *Cf. Spalding*, 463 S.W.3d at 776–77

___

[2]This accrual date does not, as Equity suggests, make CitiMortgage the "master of its own statute of limitations." *See M & D Enters., Inc. v. Wolff*, 923

("[T]he claim for breach of contract did not accrue until [the defendant] allegedly failed or refused to adequately compensate [the plaintiff] . . . as required under the [contract]."). Indeed, it is clear from CitiMortgage's complaint that it sued Equity for breaching its obligation to repurchase the loans, not for the act of selling defective loans in the first place.

B.

The six loans that had gone through foreclosure are a different story. CitiMortgage has not explained what, exactly, Equity was supposed to repurchase. If the residential-mortgage loans still existed, then CitiMortgage was within its rights to demand that Equity repurchase them. But sometimes residential-mortgage loans cease to exist after foreclosure, such as by operation of state law, *see, e.g.*, Tex. Prop. Code § 51.003(a) (establishing a short statute of limitations for certain post-foreclosure deficiency judgments in Texas, where several of the properties were located), or through discharge in federal bankruptcy proceedings, *see generally* 11 U.S.C. §§ 727, 1328. So without evidence of what, if anything, remained of the underlying loans, we are left guessing about whether Equity breached by failing to fulfill its repurchase obligation.

Rather than pointing to evidence showing that these loans still existed, CitiMortgage insists that it does not matter. In its view, it is entitled to money damages either way.

CitiMortgage's argument, however, conflates the two *distinct* remedies available under the cure-or-repurchase provision: "repurchase" of the loan—the

---

S.W.2d 389, 398–99 (Mo. Ct. App. 1996) (explaining that Missouri courts try to avoid the "possibility of control of the statute of limitations by parties"). After all, CitiMortgage's right to sue Equity for failing to fulfill its obligation to repurchase the defective loans arose only when *Equity* failed to act. *See Spalding*, 463 S.W.3d at 775–77; Mo. Rev. Stat. § 516.100.

remedy it sought—*or* "other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price)." CitiMortgage's current theory that it was entitled to compensation no matter what was left of the loans fits in the second category, not the first.[3] Yet CitiMortgage has always claimed that Equity breached because it failed to "comply with its *repurchase* obligations," which falls into the first category. (Emphasis added). So its current theory is inconsistent with the remedy it has sought all along.

CitiMortgage also seeks refuge in the Agreement's repurchase-price formula, which allowed CitiMortgage to recoup "foreclosure expenses" in a forced repurchase.[4] The fact that the Agreement recognized the prospect of foreclosure, however, does not prove as much as CitiMortgage thinks. It is possible, for example, for CitiMortgage to have incurred foreclosure-related expenses *before* any of the

---

[3]The existence of the other-remedies clause also addresses CitiMortgage's argument that an open-ended interpretation of the cure-or-repurchase provision is necessary to avoid "let[ting] Equity off the hook" for selling defective loans. Even if the original loans could not be repurchased because they no longer existed, CitiMortgage had another remedy available to it that it never invoked.

[4]The full repurchase-price formula is:

the sum of: (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or *foreclosure expenses*, etc.) incurred in connection with the servicing of the mortgage loan, (iv) any price paid in excess of par by CitiMortgage on the funding date, and (v) any other fees, costs or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(emphasis added).

properties entered foreclosure, which CitiMortgage could then have passed along to Equity as part of a forced repurchase. Or the formula might account for a situation in which a loan survived foreclosure and there was something left for Equity to buy. Either way, the reference to "foreclosure expenses" in the repurchase-price formula does not establish that CitiMortgage could force Equity to repurchase something that had ceased to exist.

Indeed, the repurchase-price formula accounted for only half of the impact of a foreclosure. It mentioned foreclosure expenses, but was completely silent on foreclosure proceeds. So if CitiMortgage's theory is correct, it could have conceivably recovered both the pre-foreclosure face value of the loan *and* any proceeds from the sale of the property, leaving it with a substantial windfall, if not a double recovery. *Cf. Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54 (Mo. banc 2005) ("A party should be fully compensated for its loss, but not recover a windfall."); *Star Dev. Corp. v. Urgent Care Assocs.*, 429 S.W.3d 487, 491 (Mo. Ct. App. 2014) ("Generally, liquidated damages clauses in contracts are enforceable, while penalty clauses are not."). CitiMortgage urges us to simply ignore this problem by construing the Agreement to allow Equity to deduct "any sums recovered in the case of foreclosure."[5] No matter how much sense this may make now, the repurchase-price formula itself said something else.

---

[5]The dissent presents a different theory. Relying heavily on the Fannie Mae and Freddie Mac Selling Guides, the dissent says that "repurchase" and "repurchase price" are "established terms of art in the secondary mortgage industry." *Post*, at 13–14. These Guides, to the extent they are relevant, tend to undercut the dissent's argument. After all, the repurchase-price formula for Real Estate Owned properties explicitly requires the deduction of all "sale proceeds"—a critical term that has no counterpart in CitiMortgage's repurchase-price formula. Freddie Mac, Snapshot of the Single-Family Seller/Servicer Guide published December 17, 2010, at 72-3, available at https://sf.freddiemac.com/content/_assets/resources/pdf/guide-snapshot/2010guide.pdf.

Finally, CitiMortgage points to a provision in the Agreement that required it to provide the mortgage file to Equity "*[i]f* [a] defective Loan [was] owned by [CitiMortgage] at the time of repurchase." (Emphasis added). CitiMortgage says that this provision, by negative implication, shows that the Agreement contemplated the repurchase of loans owned by a third party. CitiMortgage then jumps to the conclusion that Equity should have had to repurchase all the loans it sold, even those that had ceased to exist.

Once again, CitiMortgage puts too much weight on a contractual provision designed to accomplish something else. This term simply addressed situations in which CitiMortgage had already resold a loan—which in fact occurred here and is a common practice within the industry. Certainly, it did not say, or even imply, that Equity must repurchase loans that may not exist anymore.

III.

We accordingly affirm the judgment.

LOKEN, Circuit Judge, concurring in part and dissenting in part.

I concur in Part II.A. of the court's opinion, which affirms judgment in favor of CitiMortgage, Inc ("CitiMortgage" or "CMI"), on six loans that had not been through foreclosure when CitiMortgage demanded that Equity Bank, N.A. ("Equity"), repurchase them. I respectfully dissent from the court's decision in Part II.B. to affirm the dismissal of CitiMortgage's claims regarding six foreclosed loans.

The court decides that the word "repurchase" has a plain contractual meaning without adequately explaining the use of that term in the complex contract at issue. In 2006, CitiMortgage and Equity entered into a "Correspondent Agreement Form 200" in which CitiMortgage agreed to purchase mortgage loans originated by Equity. CitiMortgage and Equity were participating in the nationwide secondary

market for residential mortgage loans. CitiMortgage served as a middleman, buying nearly five hundred mortgage-secured loans from Equity, the originating lender, and reselling most loans to investors in the secondary market. After the market collapsed during the 2008 financial crisis, investors and middlemen such as CitiMortgage discovered that many loans did not comply with the originators' contractual representations and warranties. The Form 200 Agreement, "the result of an arm's length negotiation between two sophisticated commercial entities," gave CitiMortgage unfettered discretion to declare that a loan purchased from Equity was defective and obligated Equity "to repurchase defective loans on demand." CitiMortgage, Inc. v. Chicago Bancorp, Inc., 808 F.3d 747, 754 (8th Cir. 2015). "A repurchase provision is designed to shift the risk to the selling party in the event that a dispute arises." Resolution Tr. Corp. v. Key Fin. Servs., Inc., 280 F.3d 12, 18 (1st Cir. 2002).

CitiMortgage sold the six foreclosed loans at issue to investors Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac). Fannie Mae and Freddie Mac foreclosed on the underlying mortgages before CitiMortgage demanded that Equity repurchase the six loans.[6] The district court held that "Equity did not have a contractual obligation to 'repurchase' the Liquidated Loans, because at the time of the repurchase demand they had already been foreclosed on, the property underlying them had been sold, and the loans no longer existed." This was error. The loans were not "liquidated" by the mortgage foreclosure. A mortgage is a security interest in real property that serves as collateral for the borrower's loan. When the mortgage is foreclosed, the underlying promissory note (the "loan") is not "liquidated" or "extinguished." If foreclosing on the collateral does not recover the outstanding balance on the loan, the debt survives foreclosure and the mortgagor (borrower) is still liable for the

---

[6]Fannie Mae and Freddie Mac sold four of the foreclosed properties before demanding that CitiMortgage repurchase the defective loans. CitiMortgage repurchased the other two loans and resold the foreclosed properties itself.

resulting deficiency (absent further action such as a new agreement or discharge of the debt in bankruptcy). See Lindell Tr. Co. v. Lieberman, 825 S.W.2d 358 (Mo. App. 1992).

Equity admits that it breached the Form 200 Agreement when it refused to cure the defects or repurchase the six defective loans. Rather than endorse the district court's erroneous conclusion that the loans did not "exist," the court concludes that CitiMortgage has *no* claim for this breach of contract because it asserted the wrong contract remedy. This counterintuitive conclusion requires a closer look at the remedial provisions in Section 11 of the Form 200 Agreement. Section 11 provides in relevant part:

11.    CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to the Agreement:

\* \* \* \* \*

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by [Equity] of any representation, warranty or covenant contained in this Agreement or the CMI Manual . . . .

[Equity] will, upon notification by CMI, correct or cure such defect . . . to the full and complete satisfaction of CMI. If [Equity] is unable to correct or cure such defect within the prescribed time, [Equity] shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the

-12-

price required by CMI ("Repurchase Price") or (ii) agree to such other remedies . . . as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, [Equity] shall . . . pay to CMI the Repurchase Price . . . . If such defective Loan is owned by CMI at the time of repurchase by [Equity], CMI shall, upon receipt of the Repurchase Price, release to [Equity] the related mortgage file and . . . deliver such instruments . . . as shall be necessary to vest in [Equity] title to the repurchased Loan.

"Glossary 2301" of CMI's Correspondent Manual defined "Repurchase Price" as the sum of:

(i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances . . . incurred in connection with the servicing of the mortgage loan, (iv) any price paid in excess of par by [CMI] on the funding date, and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor [if they] exceed the total of items (i) through (v) above.

The court simply ignores the context and scope of this contractual "repurchase" remedy. Prior to CitiMortgage demanding that Equity repurchase the defective foreclosed loans, Fannie Mae and Freddie Mac had notified CitiMortgage of the loan defects and demanded that the loans "be repurchased" by middleman CitiMortgage in accordance with governing Fannie Mae and Freddie Mac Guides. The Freddie Mac demand letters specifically referenced three "repurchase procedures . . . stated in full in Section 78.20 of the Guide." The third category, "Real Estate Owned" (REO) loans, specified the method of calculating the

-13-

"Repurchase Price" for a mortgage loan that has been foreclosed. Similarly, Fannie Mae's Selling Guide defined "Repurchase Date" as the date "a lender is required to repurchase a mortgage *or an acquired property* from Fannie Mae." (Emphasis added.) In my view, this is conclusive evidence that the terms "repurchase" and "repurchase price" in Section 11 simply reflected established terms of art in the secondary mortgage industry, as Equity knew or should have known. By demanding that Equity "repurchase" foreclosed loans, CitiMortgage was invoking a remedy unambiguously provided in Section 11 of the Form 200 Agreement, using standard industry language. For the court to instead conclude that CitiMortgage has no remedy for Equity's breach of contract works an injustice that thoroughly compromises our careful opinion in Chicago Bancorp. See CitiMortgage, Inc. v. Royal Pac. Funding Corp., No. 4:16cv00210 PLC, 2017 WL 3116135, at *9 (E.D. Mo. Jul. 21, 2017) (rejecting the conclusion the court reaches in this case as contrary to Chicago Bancorp).

Even though Section 11 expressly contemplated repurchase where a defective loan is not owned by CitiMortgage at the time of repurchase, the court cites the fact that the Repurchase Price formula does not take into account foreclosure proceeds, leaving CitiMortgage with a "substantial windfall" if it is allowed to repurchase, as a reason to deny CitiMortgage any contractual remedy for the foreclosed loans. This is a classic red herring.[7] First, as the court notes, under Missouri law, a "party should be fully compensated for its loss, but not recover a windfall." Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc., 155 S.W.3d 50, 54 (Mo. banc 2005). Preventing a windfall in a breach of contract action warrants reducing a party's damage claim; it does not warrant dismissing the claim altogether. Second, before the district court, Equity conceded that the "Repurchase Price" is the proper measure of damages for CitiMortgage's breach of contract claims. Finally, and more importantly, the summary judgment record contains unrefuted evidence that CitiMortgage would include an "REO Sale Proceeds" credit for the foreclosure proceeds in its calculation

_____

[7]A diversion intended to distract attention from the real issue.

-14-

of the "Repurchase Price" claims for the six foreclosed loans. This calculation would provide CitiMortgage its actual contract losses, not a windfall.[8]

For these reasons, I would reverse the grant of summary judgment dismissing these six claims, leaving Equity free on remand to challenge CitiMortgage's application of the Repurchase Price formula in calculating its actual losses on the foreclosed loans. As the parties settled their damages disputes concerning the six unforeclosed loans, I join the court in affirming the district court's final judgment in favor of CitiMortgage on those claims.

_____

[8]The court errs in faulting CitiMortgage for not providing "evidence of what, if anything, remained of the underlying loans." Supra p. 7. Not only is this a flawed view of the summary judgment record, it is a factual issue that does not warrant the grant of summary judgment.